Joyce Weaver Johnson
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
E-mail: uslit@muni.org

Attorney for Defendants
Municipality of Anchorage
Anchorage Police Department
Walt Monegan
Officers Voss and Henikman

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CAROLYN MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT and | ) |
| the MUNICIPALITY OF ANCHORAGE, a | ) |
| municipal corporation, WALTER MONEGAN, | ) |
| Officer HENIKMAN, and Officer J. VOSS, | ) |
| | ) |
| Defendants. | ) Case No. 3:05-cv-00273-JWS |
| | ) |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendants Municipality of Anchorage, Walt Monegan and Officers Henikman and

Voss, through counsel, the Municipal Attorney's Office, move for summary judgment on all

claims alleged in Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 56. This

brief will show there is no genuine issue of material fact on any of Plaintiff's Sec. 1983 and

state law claims, and her Complaint should be dismissed as a matter of law.

Defendants reserve the right to move for qualified immunity, if any Constitutional violation is found.

## I.    INTRODUCTION

Ms. Mitchell was detained by Anchorage Police Department (APD) Officers Henikman and Voss for approximately 20-30 minutes as a suspect in a bank robbery that had occurred 15 minutes before they stopped her. She claims that the Municipality of Anchorage, including its police department, former Chief Walt Monegan and Officers Henikman and Voss (hereinafter collectively "the Municipality") are liable to her for Fourth Amendment civil rights violations, false arrest, defamation, and intentional infliction of emotional distress (IIED). These claims fail as a matter of law because APD officers did not exceed the scope of their authority under the Fourth Amendment and neither negligently published false defamatory statements nor intentionally caused Ms. Mitchell's emotional distress. Defendants are entitled to summary judgment.

## II.    FACTS

On May 8, 2004, at approximately 3:30 p.m., APD was dispatched on the report of an armed bank robbery at the Wells Fargo Bank located at the Sears Mall, 600 E. Northern Lights Boulevard. (Henikman depo., Ex. A at 13-14; Voss Aff. at ¶ 2, referring to his police report, Ex. B at Bates No. 9.)  Police radio broadcast a description of the robber provided by the bank teller, Yagga Touray.  Touray stated that the suspect had mentioned she had a gun. (Ex. A at 14; Voss Aff. at ¶ 3.)  Other descriptions of the bank robbery suspect were provided

by other witnesses who had been at the bank at the time of the robbery; these descriptions were aired by dispatch to all officers between 3:32 p.m. and 3:40 p.m. (Voss Aff. ¶ 3, Calls for Service Inquiry Response, Ex. C at pp. 1-2, cited in Voss affidavit ¶ 3.)  In general, and in the various iterations broadcast, the suspect was described as a black female adult, heavy set, 5'9" tall, wearing a dark shirt and a black bandana or headband on her head, and carrying a bag. *See* id.

As the radio traffic (Ex. C) clearly shows, the scene was dynamic and chaotic. Nonetheless, Officers Henikman and Voss were well aware that the suspect was a black female adult, heavy set, carrying a bag.  (Ex. A at 14; Voss depo., Ex. D at 11, lines 5-22.)

Officers Henikman and Voss noticed a female exit the Sears Mall doors who generally matched the description of the bank robbery suspect. (Ex. A at 14; Ex. D at 11, lines 5-22.) Ms. Mitchell is a black female adult, 5'4" tall, weighing approximately 180 pounds (Ex. B, Bates No. 18); at the time of the bank robbery, she was wearing a white Nike jumpsuit and a blue shirt. (Henikman Aff. at second ¶ 5.[1])  Officer Henikman placed the suspect in handcuffs while Officer Voss covered Officer Henikman with his gun drawn.  (Henikman Aff. ¶ 6; Ex. D at 25, lines 4-14.) Officer Henikman searched the suspect's purse and identified her as Carolyn Mitchell by her military ID. The officers took Ms. Mitchell and held her in handcuffs near a police car approximately 50 feet from the point of her apprehension, (Ex. D at 43, lines 3-8), for approximately 20–30 minutes (Mitchell depo., Ex. E at 22, lines 15-18).  During this time, Officers Voss and Henikman guarded Ms. Mitchell.  They had

---

1  After Officer Henikman had signed his Affidavit, Counsel noticed it had two paragraphs numbered "5".

their guns at guard. (Ex. E at 73, lines 1-4.)  The guns were hanging in their slings, not

pointed directly at Ms. Mitchell.  (Ex. A at 18, lines 16-23, Ex. D at 16, line 18, to 18, line

14.) Officers explained to Ms. Mitchell that she was being detained until the bank teller could

be brought by to identify her as the bank robber (Ex. E at 21, ll. 12-14; 22, ll. 5-6; Henikman

Aff. ¶ 8.)

While Ms. Mitchell was being detained, her 12-year-old son, Demarcus Mitchell, was

within the sight of the officers. (Henikman Aff. ¶ 9.)  While detained, Ms. Mitchell requested

that the officers allow her son to use her cell phone (Ex. E at 20, l. 25 to 21, l. 2; Henikman

Aff. ¶ 9.)  The officers did not allow the use of the phone for reasons of officer safety and

general public safety. (Henikman Aff. ¶ 9.)  However, the officers allowed Ms. Mitchell's

friend, Charolott Lacato, to stand by her side while she was detained, and allowed another

friend, Jerod Lacato,[2] to stand with her son, Demarcus. (Ex. E at 73, ll. 21-25; 74, ll. 1-4.)  A

local television camera crew's video footage shows the friend, Ms. Lacato, keeping Ms.

Mitchell company.  Ex. F.

Other women matching the description of the bank robbery suspect were detained.  An

APD officer brought Touray around the mall and conducted showups with the three other

suspects, then drove by Ms. Mitchell. Immediately after the officers learned that Ms. Touray

had indicated Ms. Mitchell was not the bank robber, they released her and explained the

---

2  The spellings used in the deposition transcript are here revised to reflect the spellings used in plaintiff's witness list.

reason for her detention. (Henikman Aff. ¶ 10; Ex. D at 55, line 9- p. 56, line 4.

At approximately 6:15 p.m., bank robbery suspect Cynthia Washington was spotted downtown by another APD officer and detained at the Anchor Arms Hotel. Touray was again driven by for a showup. Touray positively identified Washington as the robber. Washington was placed under arrest and turned over to the FBI. (Ex. B at Bates Nos. 1, 3,4,6,7,8,11,13,14). Washington later pled guilty to federal charges of bank robbery and served a sentence in federal prison.

A local television station, KTUU Channel 2 News, ran a story on the bank robbery four times on May 8 and 9. Footage from the scene includes some depicting Ms. Mitchell standing calmly, arms behind her back, with two police officers and a civilian woman. (Ex. F). The footage does not show handcuffs; it does not identify Ms. Mitchell by name, and it states that no one has been arrested. *Id.* KTUU later reported that the bank robber, Cynthia Washington, was in police custody. *Id.*

On December 14, 2004, responding to a letter from Ms. Mitchell, then - APD Chief Monegan sent a letter to Ms. Mitchell thanking her for her cooperation in the investigation and apologizing for any embarrassment that she experienced as a result of the incident. (Ex. G, Monegan's Interrogatory Responses 12-14 and attached letter.)

Ms. Mitchell sued MOA, Chief Monegan, and Officers Henikman and Voss alleging civil rights violations under 42 U.S.C.§ 1983, false arrest, slander per se, and IIED. Complaint at ¶¶ 3.1-6.5.)

Under the undisputed facts summarized above, Defendants are entitled to summary

judgment.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Because the facts surrounding Ms. Mitchell's brief detention are not in dispute, her claims are ripe for summary judgment.

## IV.    ARGUMENT

### A.    <u>Ms. Mitchell's Fourth Amendment Rights Were Not Violated; Her Section 1983 Claims Fail.</u>

Officers Henikman and Voss did not violate Ms. Mitchell's Fourth Amendment rights.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."

*Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (quoting *U.S. v. Arvizu*, 534 U.S. 266 (2002), and citing *Terry v. Ohio, infra.)*

The U.S. Supreme Court, in *Terry*, had created a limited exception to the general rule that police detentions require probable cause. *Terry v. Ohio*, 392 U.S. 1 (1968).

Under *Terry* and its progeny, the Fourth Amendment allows police to conduct a brief investigatory search or seizure, so long as they have a reasonable, articulable suspicion that justifies their actions.

*Gallegos*, 308 F.3d at 990.  In fact, *Terry* and *Gallegos* teach that stopping innocent people is inevitable:

"*Terry* accepts the risk that officers may stop innocent people.  Indeed, the Fourth Amendment accepts that risk" as well. . . . Courts cannot prevent mistakes such as this from taking place; we can only ensure that mistakes are

kept to a minimum by requiring officers to act reasonably, for articulable reasons, and not on a hunch.

*Gallegos* at 992 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 126, 120 S.Ct. 673 (2000).)

### 1.    Ms. Mitchell's Detention Was an Investigatory Stop, Not an Arrest.

Ms. Mitchell's brief detention did not amount to an arrest. An arrest is defined by AS 12.25.160 as "the taking of a person into custody in order that the person may be held to answer for the commission of a crime." ALASKA STAT. § 12.25.160 (2005). The statutes further provide that "a peace officer may use nondeadly force and may threaten to use deadly force whenever he reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a *lawful stop*." *Howard v. State*, 664 P.2d 603, 609 (Alaska 1983) (emphasis added) (quoting from the legislative comment to § 11.81.370(a).) There is no bright line rule to distinguish between an arrest and an investigatory stop; specific circumstances are to be considered and the intrusiveness of the stop to be evaluated. *Gallegos*, 308 F.3d at 991. The Alaska Supreme Court in *Howard* set forth a five-factor test to determine whether a detention is a valid investigatory stop: 1) The stop must be limited to an investigation of a crime of violence or involving serious and substantial loss to property; 2) The stop must be limited and for the purpose of a specific inquiry soon to be resolved; 3) The stop must be brief; 4) The stop must not require travel of an appreciable distance; and 5) The force used must be proportional to the risk reasonably foreseen by the officer at the time of the stop. *Howard,* 664 P.2d at 609-610.

### a.    Ms. Mitchell Was Detained for the Purpose of Investigating

**a Bank Robbery, a Crime of Violence.**

Ms. Mitchell's detention was limited to the investigation of a bank robbery. To be valid, a stop must first be limited to the investigation of a crime of violence or involving serious and substantial loss to property. *Howard* at 609. These include crimes such as sexual assault and burglary. *See Gallegos*, 308 F.3d at 989 (burglary); *Howard*, 664 P.2d at 611 (sexual assault). The *Gallegos* court held that the detention of the plaintiff, where he was mistaken for a burglary suspect, did not exceed the bounds of a valid investigatory stop. 308 F.3d at 989, 993. At the time of Ms. Mitchell's detention, APD officers were looking for a bank robbery suspect described as carrying a gun. Like burglary and rape, bank robbery is a crime of violence.

**b.    The Sole Purpose for Ms. Mitchell's Brief Detention Was to Allow the Victim of a Bank Robbery to Identify the Suspect.**

Ms. Mitchell was detained solely to allow the victim to verify the suspect's involvement in a bank robbery. As noted above, investigatory stops must be limited and for a specific inquiry soon to be resolved. An investigatory stop must be for the specific purpose of maintaining the status quo while description/identification of a suspect is verified. *Howard*, 664 P.2d at 611. In *Howard*, police officers stopped a man suspected of sexual assault for the limited purpose of "maintaining the status quo while they verified the description of the suspect furnished by the victim." *Id.* In *Gallegos*, the plaintiff's detention was a valid investigatory stop where officers made the stop "solely to make sure they had the right man." 308 F.3d at 992.

Officers stopped four people who matched the suspect's description, including Ms.

Mitchell, in and around the Sears Mall where the bank robbery had occurred. As in *Gallegos* and *Howard*, the sole purpose for these stops was to allow the bank teller to identify them. Officers Voss and Henikman's stop of Ms. Mitchell was limited and for the specific purpose of allowing a victim – the bank teller – to identify the suspects.

### c. Ms. Mitchell's Detention Was Brief and She Was Released Immediately After APD Officers Confirmed She Was Not the Bank Robbery Suspect.

Ms. Mitchell's stop was also brief. While there is no "rigid time limitation," stops have been held to be brief where there was no unnecessary delay to a legitimate investigation and where suspicions are dispelled quickly. *Gallegos*, 308 F.3d at 992. The *Gallegos* court found a 45-60 minute detention to be brief where the plaintiff was released immediately after the neighbor confirmed he was not the man who had attempted a burglary. *See id.* Ms. Mitchell's 20-30 minute detention was shorter than that in *Gallegos* and, as in *Gallegos*, Ms. Mitchell was released immediately after the victim, the bank teller, confirmed that she was not the woman who had committed the bank robbery. Ms. Mitchell's stop was brief.

### d. Ms. Mitchell's Detention Did Not Involve Travel of an Appreciable Distance.

Not only was Ms. Mitchell's stop brief, but it also did not involve travel of an appreciable distance. There is again no bright line rule that defines what an appreciable distance is; however, in *Gallegos*, a valid investigatory stop involved travel of a "few miles." 308 F.3d at 989. Ms. Mitchell was handcuffed when she was about 15 feet from the exit of Sears Mall, Ex. A at 16, line 22, and remained within that general area, or "several feet", "not far from where I found her," Ex. A at 35, line 13, to 38, line 8, just about 50 feet from Voss's

patrol car, Ex. D at 43, line 7, a distance much less than "a few miles." Ms. Mitchell's stop

did not involve travel of an appreciable distance.

> **e.    The Force Used by Officers Henikman and Voss Was Reasonable Given the Risk Involved in Apprehending and Detaining a Suspect in an Armed Bank Robbery.**

Ms. Mitchell's stop only involved force proportional to the risk reasonably foreseen

by the officers at the time of the detention. Courts have concluded that "drawn guns and

handcuffing do not necessarily turn a stop into an arrest." *Gallegos*, 308 F.3d at 991;

*Howard*, 664 P.2d at 609. AS 11.81.370(a) provides that "a peace officer may use nondeadly

force and may threaten to use deadly force whenever he reasonably believes it necessary to

make an arrest . . . or to make a *lawful stop*." *Howard* at 609, quoting from the legislative

comment to § 11.81.370 (emphasis added). The *Howard* court concluded that § 11.81.370

therefore supports the theory that a show of force followed by temporary restraint and

submission to custody does not necessarily turn a stop into an arrest. 664 P.2d at 609.

In *Gallegos*, the court concluded that drawn guns were not unreasonable because

police were unsure if the plaintiff/suspect was armed; that handcuffs were not unreasonable

because the police were unsure of the plaintiff/suspect's identity; and that holding the

plaintiff/suspect to be identified by the victim was not an unreasonable way of finding out if

he was the person they were looking for. 308 F.3d at 991.  In *Howard*, the amount of force

used was held to be proportional to the risk reasonably to be foreseen by the officers where

the suspects were wanted for a serious crime of violence and known to be armed, and where

there were as least as many suspects as officers. 664 P.2d at 611.

Like the officers in *Gallegos*, Officers Henikman and Voss did not know whether Ms. Mitchell, a suspect matching a bank robber's description, was armed; they were unsure of Ms. Mitchell's identity; and they held Ms. Mitchell for the purpose of being identified by the victim bank teller. The Ninth Circuit in *Gallegos* stated that the Fourth Amendment accepts the risk that officers may stop innocent people. 308 F.3d at 992. Similar to the suspects in *Howard*, Ms. Mitchell was a suspect in a bank robbery, who matched the description of a suspect who was thought to have been armed. Furthermore, whereas the two officers in *Howard* faced only two possible suspects, the APD officers in this case were far outnumbered by potential suspects and members of the public at a crowded shopping mall. Officers Henikman and Voss reasonably believed Ms. Mitchell to be a possible match for the reportedly armed bank robber (Henikman Aff. at second ¶ 5; Voss Aff. ¶ 4); thus, the force used was not disproportionate to the risk reasonably foreseen at the time. Ms. Mitchell's detention satisfies all the elements of *Howard*'s five-factor test for a valid investigatory stop set forth above.

### 2.    Ms. Mitchell's Investigatory Stop Was Reasonable.

Officers Henikman and Voss had reasonable, articulable suspicion to detain Ms. Mitchell. If an individual's detention is an arrest, the Constitution requires that the arresting officers have "probable cause" to justify their actions; however, because Ms. Mitchell's detention was only an investigatory stop, falling short of an arrest, it need only be based on "reasonable suspicion". *See Gallegos*, 308 F.3d at 990. The reasonable suspicion standard "is a less demanding standard than probable cause," and merely requires "a minimal level of

objective justification." *Id.* An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion. "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22.

Applying the rule set forth in *Terry*, the Alaska Supreme Court held in *Coleman v. State*, 553 P.2d 40 (1976), that in light of facts known to the officers at the time – that a robbery had just occurred at a golf course within minutes and that officers observed a man near the golf course that fit the physical characteristics of the suspect, described as a short black man wearing a white T-shirt and Levis – they "had the right and the duty to make a prompt investigation which required . . . as a matter of practical necessity to stop the car and question"; the stopping and questioning was a "reasonable course of action in light of the circumstances confronting them; and being reasonable, it was lawful under the Fourth Amendment . . . " *Coleman*, 553 P.2d at 46 (citations omitted).

Ms. Mitchell generally fit the physical characteristics of the bank robbery suspect described as a heavy-set black female adult wearing a blue t-shirt. It was the duty of Officers Henikman and Voss to make a prompt investigation, which unfortunately required them and other officers to stop innocent people at the mall. However, the stopping of Ms. Mitchell was eminently reasonable in light of the circumstances that a bank robbery had just occurred and that Ms. Mitchell matched the most salient physical characteristics of the suspected bank

robber. Being reasonable, the stop was lawful under the Fourth Amendment. Thus, Ms.

Mitchell's claim alleging civil rights violations under 42 U.S.C. § 1983 fails.

### B.    The Officers Had Proper Legal Authority to Detain Ms. Mitchell; a False Arrest Did Not Occur.

Ms. Mitchell's false arrest claim fails because her detention was with proper legal

authority. Under Alaska law, which governs this claim, false arrest and false imprisonment

are not separate torts. A false arrest is one way to commit false imprisonment. *City of Nome*

*v. Ailak,* 570 P.2d 162, 168 (Alaska 1977).  The elements of a false arrest/false imprisonment

claim are:  (1) a restraint upon plaintiff's freedom, (2) without proper legal authority.

*Waskey v. Municipality of Anchorage*, 909 P.2d 342, 345 (1996).  As discussed *supra*, *Part*

*A.1*, Ms. Mitchell's detention did not amount to an arrest; it was an investigatory stop only.

However, an investigatory stop was nonetheless a restraint upon Ms. Mitchell's freedom.

Nevertheless, a defendant is not liable for false arrest unless the restraint was without proper

legal authority. *Id.*

Again, no *arrest* was here involved.  However, to analyze whether a *restraint* was

without proper legal authority, it is instructive to look to authority that addresses the issue of

what constitutes reasonable cause to make an arrest.  Sections (1) and (2) below will assume,

*arguendo*, that this case involved an actual arrest rather than the detention established at part

(1)(a) above.

The Alaska Supreme Court has held that where there is no factual dispute, what

constitutes reasonable cause to make an arrest is a matter of law to be decided by the court.

*Ailak,* 570 P.2d at 170.  (It is therefore suitable for dismissal on summary judgment.)  AS

12.25.030 provides that a peace officer may arrest without a warrant "when a felony has in fact been committed, and the person making the arrest has reasonable cause for believing the person to have committed it." § 12.25.030(a)(3).

### 1.   At the Time of Ms. Mitchell's Stop, a Bank Robbery Had in Fact Just Been Committed.

Ms. Mitchell's stop was with proper legal authority because, first, a felony – a bank robbery – had in fact been committed. There must exist facts and circumstances known to the officer which would warrant a prudent person in believing that an offense has been or is being committed. *Ailak*, 570 P.2d at 170.  Officers Henikman and Voss had been dispatched and were responding to a bank robbery, a federal felony, at Wells Fargo Bank when Ms. Mitchell was detained as a potential suspect. A felony, the bank robbery, had in fact just been committed.

### 2.   Ms. Mitchell Generally Matched the Bank Robbery Suspect's Description; the Officers Had Reasonable Cause to Believe She Had Committed the Felony.

In addition to the fact that a felony had been committed, there also existed reasonable cause to believe Ms. Mitchell may have committed that felony.  Probable cause (again assuming *arguendo* that an arrest were here involved) may rest on reasonably trustworthy information from an informant. *Ailak* at 170.  If the informant is a cooperative citizen rather than an informant from a criminal milieu, his or her reliability need not be established before the arrest. *Id.* In *Ailak*, the court held as a matter of law that arresting officers were without probable cause to arrest Ailak because the officers "obtained all of their pre-detention information from . . . a citizen informant . . . [who] indicated to the officers that the

information he provided was hearsay obtained from . . . [a woman] whose only contact with the officers at that point had been to run away from them." *Id.* at 170. Unlike the officers in *Ailak*, Officers Henikman and Voss relied on information from the bank teller, who was a cooperative citizen, regarding the physical description of the suspect. The officers detained Ms. Mitchell because she generally matched the physical description, provided by the bank teller, of a heavyset black female adult.

In a recent unpublished Alaska Supreme Court decision, the Court, in reversing a grant of summary judgment in favor of a state trooper for false arrest claims, concluded that the Superior Court "could not determine as a matter of law that Kemp [defendant] acted reasonably or that a jury would inevitably find that Kemp was reasonable in believing that Crawford's [plaintiff] actions justified an arrest for disorderly conduct" and that there was a "genuine issue of material fact as to the lawfulness of Kemp's arrest of Crawford." *Crawford v. Kemp*, 139 P.3d 1249, 1255 (2006). In *Crawford*, a state trooper approached the plaintiff to investigate whether he was the suspect in a domestic violence restraining order incident. *Id.* at 1251. The plaintiff was uncooperative and the state trooper arrested him for disorderly conduct; the plaintiff filed a complaint that included a claim of false arrest. *Id.* at 1252. There was testimony that the plaintiff was "loud and disruptive" and there was also testimony that the plaintiff "spoke in a normal tone of voice." Based on these factual disputes, the defendant's grant of summary judgment was reversed for the fact finder to determine whether there was probable cause to arrest. *Id.* at 1259. Ms. Mitchell's claims are distinguishable from the claims in *Crawford*, because there are no genuine issues of material

fact regarding the circumstances or the conduct of the APD officers during Ms. Mitchell's detention – and, of course, because there was no arrest.

The officers had reasonable cause to believe that Ms. Mitchell had committed the felony of bank robbery that had recently occurred at the Sears Mall. Thus, Ms. Mitchell's detention was a lawful restraint and, even if, *arguendo,* her detention had turned into an arrest, her claim of false arrest/false imprisonment would still fail.

### C.    <u>Defendants Are Not Liable for Defamation.</u>

Ms. Mitchell's defamation claim fails because a defamatory statement was not made, the officers did not negligently publish a false and defamatory statement, and neither "per se" actionability nor "special harm" exists. To prevail on a defamation claim, a plaintiff must establish:

> (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either "per se" actionability or "special harm".

*French v. Jadon*, 911 P. 2d 20, 32 (Alaska 1996).

It is not established that the act of detaining Ms. Mitchell resulted in any "statement" published to third parties at or near the Sears Mall at the time of the detention.  However, assuming *arguendo* that it was a "statement" for purposes of defamation law, the statement was not defamatory, is not "per se" actionable, did not result in "special harm", and Officers Henikman and Voss are not negligent for publishing a false statement.

### 1.    **Ms. Mitchell's Temporary Detention Was Not a Defamatory Statement and Is Not "Per Se" Actionable.**

In detaining Ms. Mitchell, Officers Henikman and Voss did not publish a defamatory

statement that is "per se" actionable or resulted in special harm to Ms. Mitchell. A communication is defamatory if it tends to harm the reputation of another so as to lower her in the estimation of the community or to deter third persons from associating with her. *Jadon,* 911 P.2d at 33. For a publication to be actionable per se, the statement must be so unambiguous as to be reasonably susceptible of only one interpretation – that is, one which has a natural tendency to injure another's reputation. *Id.* at 32. One who publishes a slander that imputes serious misconduct of certain types may be subject to liability to the other without the need for proof of special harm. *See Jadon* at 32-33. In *Jadon*, where the defendant affirmatively stated that the plaintiff had "traded sex for drugs," the court held that the defendant's statement was defamatory per se and she did not need to prove injury resulting from the comments. *Id.* at 33.

Unlike the defendant in *Jadon*, in detaining Ms. Mitchell, the officers did not affirmatively state that Ms. Mitchell was a bank robber. The officers detained Ms. Mitchell as a suspect, not as a convicted criminal – or even as an arrestee. Three other individuals were also detained as possible suspects in the bank robbery. A reasonable person would not have the natural tendency to assume that all four suspects detained were bank robbers. The officers' "statement," if any, was not actionable "per se."

### 2. The "Statement" Did Not Result in Special Harm to Ms. Mitchell.

Moreover, Ms. Mitchell cannot prove that special harm resulted from the "statement." If a "statement" is not "per se" actionable, the plaintiff must prove that injury resulted from the so-called "statement." *Id.* at 32. A "mere possibility of causation is not enough . . . [i]f a

plaintiff's explanation from the evidence as to how her injuries were caused is not more probable than any other explanation, she has not borne her burden of proof." *Hinman v. Sobocienski*, 808 P.2d 820, 823 (Alaska 1991) (citations omitted). Broad generalizations and unsupported conclusory allegations are not statements of fact sufficient to prevent a grant of summary judgment. *Petranovich v. Matanuska Elec. Ass'n*, 22 P.3d 451, 454 (2001).

Ms. Mitchell contends that being mistaken for a bank robber resulted in the loss of one of her hair salon clients (Ex. E at 52, lines 2-6). But the only reason she has to believe this is that the woman came in before the incident and did not return after the incident. (Ex. E at 52, l. 20-53, l. 3.) In addition, Ms. Mitchell admits that she cancelled many of her scheduled appointments with clients because she "couldn't deal with it." (Ex. E at 53, lines 4-8.) While Ms. Mitchell's *own* actions may have resulted in damage to her business, the officers' "statement" did not. Regarding the one client who stopped coming in after the bank robbery, Ms. Mitchell has nothing but speculation to support her contention that being a possible suspect resulted in losing that client. Thus, Ms. Mitchell cannot show that she suffered "special harm" resulting from the "statement" of Officers Henikman and Voss.

### 3.   The Officers Did Not Negligently Publish a "False Statement."

In addition to the officers' "statement" not being actionable "per se" and Ms. Mitchell not being able to show special harm, the officers did not *negligently* publish the "false statement." The Alaska Supreme Court has held that the jury is required to weigh actions of persons charged with negligence against the standard of conduct of a reasonable person in the

same circumstances. *Wilson v. Sibert*, 535 P.2d 1034, 1036-37 (Alaska 1975). As discussed, *supra Part IV.A.2*, citing *Coleman*, it was the duty of Officers Henikman and Voss to make a prompt investigation to identify a person who matched the physical description of a suspect in a bank robbery that just occurred. A reasonable person in the same circumstances – a police officer encountering a person matching the physical description of a bank robbery suspect in the vicinity of the scene of the crime – would have done as Officers Henikman and Voss did in stopping the suspect to investigate her involvement in the crime. Because the officers did not act negligently in publishing a false and defamatory "statement," and because the "statement" is not actionable "per se" and Ms. Mitchell cannot prove special harm resulted from it, Ms. Mitchell's defamation claim is not actionable.

## D.   Defendants Are Not Liable on Ms. Mitchell's Claim of Intentional Infliction of Emotional Distress.

Ms. Mitchell's IIED claim also fails because the officers' conduct was not a concerted effort to inflict emotional distress upon Ms. Mitchell. To establish a prima facie case of IIED, the plaintiff must prove that the defendant, through extreme or outrageous conduct, intentionally or recklessly caused severe emotional distress or bodily harm to another. *Lybrand v. Trask*, 31 P.3d 801, 803 (Alaska 2001); *Cameron v. Beard*, 864 P.2d 538, 548 (Alaska 1993). IIED liability has only been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Lybrand*, 31 P.3d at 803; *Cameron*, 864 P.2d at 548.

In *Lybrand*, where the plaintiff claimed she had suffered emotional distress as a result

of Biblical passages painted on her neighbor's roof that she claimed were vexatious and retaliatory, the court concluded that the defendant's conduct did not measure up to the outrageousness threshold required for an IIED claim. *Lybrand*, 31 P.3d at 804. The court noted that it had only held twice that a trial court abused its discretion in determining that conduct was not sufficiently outrageous to justify an IIED claim. *See Odom v. Fairbanks Memorial Hospital* and *King v. Brooks*. In those two cases, the disputed conduct involved multiple, concerted efforts to seriously damage the well-being and reputation of the plaintiff. *Id.*

Like the conduct of the defendant in *Lybrand*, the conduct of Officers Henikman and Voss did not involve multiple, concerted efforts to seriously damage the well-being and reputation of the plaintiff. Ms. Mitchell's detention was a one-time, 20-30 minute occurrence, and the officers' conduct did not amount to a concerted effort to seriously damage her well-being and reputation. The actions of Officers Henikman and Voss were the result of necessarily swift police action to identify, within minutes, suspects in and around the Mall who matched the description of a bank robber; Ms. Mitchell reasonably matched the physical description of a black female heavyset adult wearing a blue t-shirt. The officers' conduct in detaining Ms. Mitchell was for the purpose of carrying out their law enforcement duties; it was not a concerted effort to seriously damage her well-being or reputation. It is not disputed that Ms. Mitchell's temporary detention resulted in some emotional distress; however, the Municipality, including its officers, is not liable because the officers' conduct was neither extreme and outrageous nor intentional or reckless.

## V.    CONCLUSION

This court should grant the Municipality's motion for summary judgment because no genuine issues of material fact exist as to Ms. Mitchell's temporary detention, and her claims should be denied as a matter of law.

Respectfully submitted this 30th day of April, 2007.

JAMES N. REEVES
Municipal Attorney


By:    s/ Joyce Weaver Johnson
        Municipal Attorney's Office
        P.O. Box 196650
        Anchorage, Alaska 99519-6650
        Phone: (907) 343-4545
        Fax: (907) 343-4550
        E-mail: uslit@muni.org
        Alaska Bar No. 9306029

The undersigned hereby certifies that on 4/30/07 a
true and correct copy of the *Motion for Summary
Summary Judgment & Proposed Order* was served on:

**Isaac D. Zorea**
**Moshe C. Zorea**

by first class regular mail, if noted above, or by electronic
means through the ECF system as indicated on the Notice
of Electronic Filing.

 s/ Sheri Curro
Sheri Curro, Legal Secretary
Municipal Attorney's Office