```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF ALASKA

 3   CAROLYN MITCHELL,                )
                                      )
 4              Plaintiff,            )
                                      )
 5     vs.                            )
                                      )
 6   ANCHORAGE POLICE DEPARTMENT and  )
     the MUNICIPALITY OF ANCHORAGE, a )
 7   municipal corporation, WALTER    )
     MONEGAN, Officer HENIKMAN and    )
 8   Officer J. VOSS,                 )
                                      )
 9              Defendants.           )
     _____)
10   Case No.   A05-0273 CV (JWS)

11          VIDEOTAPE DEPOSITION OF OFFICER ROSS HENIKMAN

12   APPEARANCES:

13      FOR THE PLAINTIFF:         MR. ISAAC D. ZOREA
                                   MR. MOSHE CALBERG ZOREA
14                                 Attorneys at Law
                                   P.O. Box 212043
15                                 Anchorage, Alaska 99521
                                   (907) 337-7741
16
        FOR THE DEFENDANTS:        MS. JOYCE WEAVER JOHNSON
17                                 Assistant Municipal Attorney
                                   Municipality of Anchorage
18                                 632 West Sixth Avenue
                                    Suite 730
19                                 Anchorage, Alaska 99501
                                   (907) 343-4545
20
        ALSO PRESENT:              MS. CAROLYN MITCHELL
21
                      * * * * * * *
22

23

24

25
```

R & R COURT REPORTERS
811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA 99501

Exhibit A

13

| | | |
|---|---|---|
| 1 | A | It's a standard trigger with a single pull. |
| 2 | Q | All right. Let's reference are you familiar with the |
| 3 | | events related to this civil suit? |
| 4 | A | Yes. |
| 5 | Q | And this incident occurred -- is it your recollection |
| 6 | | this occurred May 8th, 2004? |
| 7 | A | Yes. |
| 8 | Q | So at that time you had been an officer -- commissioned |
| 9 | | officer for approximately how long? |
| 10 | A | I'd say year and a half. |
| 11 | Q | Year and a half..... |
| 12 | A | Approximately. |
| 13 | Q | During the course of that year and a half had you |
| 14 | | arrested very many people? |
| 15 | A | Yes. |
| 16 | Q | Approximately how many? |
| 17 | A | I don't know. |
| 18 | Q | Have you conducted -- had you conducted very many |
| 19 | | investigatory stops? |
| 20 | A | Yes. |
| 21 | Q | Could you explain what occurred on May 8th, 2004 in |
| 22 | | your words? How you came to the Sears Mall and what |
| 23 | | happened when you arrived there? |
| 24 | A | I heard a report of a armed bank robbery at the Wells |
| 25 | | Fargo Bank within inside -- or inside of the Sears |

| | | |
|---|---|---|
| 1 | | Malls.  I responded to the mall.  I set up on the |
| 2 | | southwest perimeter and maintained a perimeter |
| 3 | | position.  I heard various radio traffic indicating |
| 4 | | that there was a possible suspect described as a heavy |
| 5 | | set Black female with a bag.  As I was on the perimeter |
| 6 | | watching the southwest exit doors of the mall I |
| 7 | | observed a Black female that matched the description I |
| 8 | | heard over the radio..... |
| 9 | Q | Uh-hum. |
| 10 | A | .....walk out of the doors.  I stopped her, placed her |
| 11 | | in handcuffs.  I conducted a pat down for weapons. |
| 12 | | Identified her by her military I.D.  And I stood by |
| 13 | | with her while a show up was conducted.  The show up |
| 14 | | produced a negative result and she was released. |
| 15 | Q | Breaking that down a little bit, you said you stopped |
| 16 | | her.  How did you stop her? |
| 17 | A | I told her to turn around, face away from me, walk back |
| 18 | | towards my voice and I placed her in handcuffs. |
| 19 | Q | Were you holding any weapons? |
| 20 | A | Yes. |
| 21 | Q | What weapon? |
| 22 | A | A Remington 870 shotgun. |
| 23 | Q | What was the -- when she exited the building what was |
| 24 | | the duration of time between when she exited the |
| 25 | | building and when you placed her in handcuffs? |

15

| | | |
|---|---|---|
| 1 | A | It was within a minute. |
| 2 | Q | Was she accompanied by any other people? |
| 3 | A | Yes. |
| 4 | Q | And who was with her? |
| 5 | A | Her son. |
| 6 | Q | And how old do you think he was? |
| 7 | A | I don't remember offhand, I think he was 14 or thereabouts. |
| 9 | Q | Any other persons come out of the building with her? |
| 10 | A | No. |
| 11 | Q | What did you do regarding the son before you placed that plaintiff in handcuffs?  Did you separate them -- the suspect from the son? |
| 14 | A | Yes. |
| 15 | Q | And how did you do that? |
| 16 | A | We had him stand to the side. |
| 17 | Q | Was that you that told him to stand to the side? |
| 18 | A | I don't remember. |
| 19 | Q | Your shotgun, where was it pointed? |
| 20 | A | It was held in the guard position. |
| 21 | Q | And what does that mean? |
| 22 | A | That'll be pointed toward the area of the suspect's hands. |
| 24 | Q | Okay.  Do you recall where her hands were? |
| 25 | A | I believe she was carrying a bag in one hand. |

16

| | | |
|---|---|---|
| 1 | Q | So when you say pointed at her hands, were you pointed |
| 2 | | at the right hand or the left hand or it didn't matter? |
| 3 | A | It'd be the area of her hands. |
| 4 | Q | And what was behind the area of her hands is that her |
| 5 | | body? |
| 6 | | MS. JOHNSON: Objection, foundation, |
| 7 | | speculation. Timing. |
| 8 | A | Are you referring to the backdrop behind..... |
| 9 | Q | Uh-hum. |
| 10 | A | .....Ms. Mitchell? That'd be..... |
| 11 | Q | No, behind her hands, the back drop behind her hands, |
| 12 | | were her hands away from her body or were her hands |
| 13 | | next to her body? |
| 14 | A | Initially when she came out she was holding a bag, I |
| 15 | | believe, in one hand and they were down to her side. |
| 16 | Q | So it correct to say that you were also pointing at the |
| 17 | | side of her body with your weapon? |
| 18 | A | Yes. |
| 19 | Q | What was the distance, if you recall, between yourself |
| 20 | | and Ms. Mitchell when she exited the building when you |
| 21 | | -- before you placed her in handcuffs? |
| 22 | A | I would estimate approximately 15 feet. |
| 23 | Q | And the training that you conducted at the police |
| 24 | | academy at what distance did you fire your shotgun at? |
| 25 | A | Various distances. |

| | | |
|---|---|---|
| 1 | | the bags in her hands or whether you -- on the ground? |
| 2 | A | I don't remember. |
| 3 | Q | What prompted you to place her in handcuffs? |
| 4 | A | I placed her in handcuffs to detain her. |
| 5 | Q | Could you have detained her without placing her in |
| 6 | | handcuffs? |
| 7 | | MS. JOHNSON: Objection, speculation. |
| 8 | A | I could have, yes. |
| 9 | Q | (By Mr. I. Zorea)  During your training was there any |
| 10 | | instruction on when it was an appropriate for an |
| 11 | | officer to place somebody in handcuffs? |
| 12 | A | Yes. |
| 13 | Q | And what sort of instruction did you have concerning |
| 14 | | when you could place somebody in handcuffs? |
| 15 | A | It depends on the situation. In..... |
| 16 | Q | (Indiscernible - simultaneous speech)...... |
| 17 | A | .....this particular situation I'd information that a |
| 18 | | armed bank robbery just occurred and someone matching |
| 19 | | the description of the suspect walked out the doors. |
| 20 | | It'd be appropriate for not only my safety, but the |
| 21 | | safety of the public and the safety of that individual |
| 22 | | to be placed in handcuffs. |
| 23 | Q | So is it your testimony that you placed her in |
| 24 | | handcuffs as a safety issue? |
| 25 | A | That's one of the reasons. |

1  Q    Whose safety were you concerned about?
2            MS. JOHNSON:  Asked and answered.
3  A    I mentioned my safety, the suspect's safety and the
4       safety if the individuals walking around the shopping
5       mall.
6  Q    (By Mr. I. Zorea)  On the inside of the shop- --
7       shopping mall or.....
8  A    Anywhere.
9  Q    Yet you testified earlier that you weren't in fear for
10      your safety though, were you?
11 A    No, I wasn't.  This is what I do for a living.
12 Q    How were you protecting Ms. Mitchell's safety by
13      placing her in handcuffs?
14 A    I was securing her so that -- it's been my experience
15      that a lot of individuals who may be armed may have
16      access to a weapon, while they're secured it eliminates
17      their access to a weapon, reduces any probability of
18      force.
19 Q    After placing her in handcuffs I think you stated that
20      you did a pat down?
21 A    Correct.
22 Q    Okay.  And what -- did the pat down reveal any weapons?
23 A    No.
24 Q    Did you look inside of the purse?
25 A    Yes.

35

1 Q Did you -- did you see that and.....

2 A Correct.

3 Q Okay. I mean you see your answer?

4 A This -- it's accurate.

5 Q Okay. Okay. You state that you -- you imply that you
6   did not have control over where you moved Ms. Mitchell
7   and where you placed her, is -- is that correct? Did
8   you have control over where you placed her and where
9   you moved her after placing handcuffs on her?

10 A I did have control on where I could have placed her and
11   where I could have moved her, however, I did not move
12   her from the place that she was found.

13 Q Okay. It's your testimony other than the 15 -- you
14   testified she was 15 feet away from you when you first
15   encountered her and then she backed up to where you
16   were at. You placed her in handcuffs and she didn't
17   move for 20 minutes from that specific spot?

18 A She was within the -- that general radius.

19 Q Okay. How do you define general radius, within how
20   many square feet of where you placed the handcuffs on
21   her?

22 A General radius in my opinion would be the -- the
23   general area in which I initially contacted her. You
24   know, she was with- -- obviously moved within several
25   feet.....

1  Q   Uh-hum.
2  A   .....if you want to get technical on -- on movements.
3  Q   Uh-hum.
4  A   But she wasn't taken away from the place that -- that I found her to another location.
6  Q   Okay. Did you place her near a squad vehicle or a police vehicle?
8  A   I believe there was a vehicle nearby.
9  Q   Did you move her toward that or was she -- how -- what was the distance of her between where she was standing the majority of the time and where the squad vehicle was?
13         MS. JOHNSON: If you recall.
14 A   I can't give you an exact distance. It would be right there within the immediate area, several feet.
16 Q   (By Mr. I. Zorea) Okay. But you didn't have her stand next to the vehicle?
18 A   I don't recall exactly if she was near the vehicle or not. She would have been nea- -- several feet by the vehicle. Generally in show ups we try to have the person remain away from any type of police vehicles.
22 Q   Okay. But you did have control and the ability to move her wherever you wanted to -- .....
24 A   Yes.
25 Q   .....to move her?

1           MS. JOHNSON:  Objection, asked and answered.
2   A       That's correct.
3   Q       (By Mr. I. Zorea)  Okay.  I guess for clarification
4           concerning this request for admission you state that it
5           assumes I moved there and placed her and it assumes I
6           had a choice where to place her.  That assumption is,
7           in fact, a fact you did have control as to where you
8           placed her, is that correct?
9           MS. JOHNSON:  Objection, foundation again.
10  Isaac, may I interject a question.....
11          MR. I. ZOREA:  I think he can.....
12          MS. JOHNSON:  .....to clarify or.....
13          MR. I. ZOREA:  .....ask any questions she -- he
14  has to clarify.  I don't see the re- -- .....
15          MS. JOHNSON:  Okay.
16          MR. I. ZOREA:  .....you know, the need for you
17  to clarify.....
18          MS. JOHNSON:  I'll save.....
19          MR. I. ZOREA:  .....because I'm not even
20  asking.....
21          MS. JOHNSON:  I'll save that for follow up
22  then.
23          MR. I. ZOREA:  .....(indiscernible) questions.
24  That'd be good.
25  A       Ms. Mitchell came out of the southwest doors of the

| | | |
|---|---|---|
| 1 | | mall. |
| 2 | Q | (By Mr. I. Zorea) Uh-hum. |
| 3 | A | In the sense of the question I kept her within the area |
| 4 | | that -- that I found her. |
| 5 | Q | Uh-hum. |
| 6 | A | I think this question is referring to moving her to |
| 7 | | another location within the mall possibly. I -- I |
| 8 | | didn't move her far from where I found her. |
| 9 | Q | Okay. Well, actually just really what I want to do is |
| 10 | | clarify. A request for admission is usually a response |
| 11 | | admit or deny. And instead you've -- you've answered |
| 12 | | it by saying I'm assuming you had a choice as to where |
| 13 | | to place her. Okay. And that's -- that's an ambiguity |
| 14 | | I want to clarify. You did have the choice as to where |
| 15 | | to place her, is that correct? |
| 16 | | MS. JOHNSON: Same objections. |
| 17 | A | Well, I didn't have a choice where I found her. |
| 18 | Q | No. |
| 19 | A | I did not move her far from where I found her. |
| 20 | Q | Yeah, but you could have, is that correct? |
| 21 | A | Sure. |
| 22 | Q | You could have put her in the squad vehicle, is that |
| 23 | | correct? |
| 24 | A | I could have, yes. |
| 25 | Q | Okay. That's -- that's the ambiguity I wanted |

1  Q     More than three?
2  A     Possibly.
3  Q     Okay. You said you've done other investigatory stops.
4        During those other investigatory stops have you ever
5        placed a suspect or a person you were stopping into the
6        back of a police vehicle?
7  A     Yes.
8  Q     And what would you have done that for? To await a show
9        up?
10 A     Yes.
11 Q     Okay. 'Cause now we're getting back -- are you able to
12       articulate why on this particular occasion you chose
13       not to put Ms. Mitchell into the back of your vehicle
14       to await for the show up?
15 A     Yes.
16 Q     And what was the reason?
17 A     Generally with show ups what we try to do is have the
18       individual -- have -- have a minimal amount of police
19       presence around the individual that we're asking the
20       witness to look at so that the witness has a more non-
21       biased opportunity to make a visual determination if
22       that's the person that committed the crime that they
23       saw. A lot of times it'd be possible that if someone's
24       in the back of a police car, if they are surrounded by
25       a lot of officers that, you know, the individual may

|    |   |                                                                            |
|----|---|----------------------------------------------------------------------------|
| 1  |   | feel compelled to make a identification that may not be                    |
| 2  |   | accurate. So I was trying to make a good case and do                       |
| 3  |   | it appropriately.                                                          |
| 4  | Q | Okay. Why didn't you cover up her handcuffs -- or did                      |
| 5  |   | you cover up her handcuffs or make any effort to make                      |
| 6  |   | it so that her handcuffs were not visible to the                           |
| 7  |   | witness as they drove by?                                                  |
| 8  |   | MS. JOHNSON: Objection, relevance,                                         |
| 9  |   | speculation.                                                               |
| 10 | A | Ms. Mitchell was handcuffed behind her back and the                        |
| 11 |   | witness -- the way the witness approached in the police                    |
| 12 |   | car Ms. Mitchell was facing the police car so that the                     |
| 13 |   | witness would only see basically her hands behind her                      |
| 14 |   | back.                                                                      |
| 15 | Q | (By Mr. I. Zorea) So I think earlier you stated you                        |
| 16 |   | didn't have any communication with the officers that                       |
| 17 |   | were with the witness, how did you know from which                         |
| 18 |   | direction....                                                              |
| 19 | A | No, I said.....                                                            |
| 20 | Q | .....they would be coming?                                                 |
| 21 | A | .....that I didn't know when the officers would be                         |
| 22 |   | arriving.                                                                  |
| 23 | Q | Okay. Were you in communication with the officers who                      |
| 24 |   | were with the witness?                                                     |
| 25 | A | When the officer that arrived with the witness I had                       |

1  questions.

2                    CROSS EXAMINATION

3  BY MS. JOHNSON:

4  Q        Officer Henikman, you testified that there were various
5           scenarios that you could imagine where having Demarcus
6           next to his mother could have been dangerous. Could
7           you expand on what kinds of scenarios an officer has in
8           his mind in that type of situation?
9                    MR. I. ZOREA:  Objection, calls for
10 speculation.
11 A        Some of the things that I have to be concerned about
12          would be the potential for a hostage situation. You
13          know, someone that just committed an armed bank robbery
14          in their effort to get away make take hostages which
15          could include using their own children as a shield,
16          which could include taking someone -- shop -- some
17          citizen at the mall walking by, trying to approach a
18          vehicle and take control of a vehicle in an effort to
19          leave, things like that.
20 Q        And you mentioned a minute ago that you try to not have
21          too great a police presence around a possible suspect
22          at the time of a show up and -- and if possible to not
23          have the witness see the handcuffs, did I understand
24          that correctly?
25 A        The way I had Ms. Mitchell facing for the show up was

|   |   |   |
|---|---|---|
| 1 |   | she was facing towards the police car in which the |
| 2 |   | witness was in. And from the witness's point of view |
| 3 |   | they would observe Ms. Mitchell with her hands behind |
| 4 |   | her back. |
| 5 | Q | And let's see, when you -- Mr. Zorea was asking about |
| 6 |   | what -- basically why you didn't move Ms. Mitchell out |
| 7 |   | of sight of the media or out of sight of the public. |
| 8 |   | What are some of the reasons why you wouldn't say -- |
| 9 |   | well, for an extreme example, take her over to the |
| 10 |   | police station to wait for a show up there. Why -- why |
| 11 |   | do you leave her -- you mentioned leaving her in the |
| 12 |   | location where you found her. Why do you do that? |
| 13 | A | Well, case law has shown that when we conduct show ups |
| 14 |   | we always bring the witness to the suspect. We never |
| 15 |   | bring the suspect to the witness. We don't take a |
| 16 |   | person from where we find them and move them. That |
| 17 |   | would be considered, you know, an arrest or we would |
| 18 |   | reduce their, you know, freedom even further. And so |
| 19 |   | that's generally how we -- how we do it. And I had no |
| 20 |   | reason to take Mit- -- Ms. Mitchell to another location |
| 21 |   | from where I found her at that point. |
| 22 |   | MS. JOHNSON: That's all I have. Thank you. |
| 23 |   | MR. I. ZOREA: I have a few redirects, such a |
| 24 |   | broad scope of redirect, but..... |
| 25 |   | MS. JOHNSON: I didn't give you a lot of |