```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ALASKA

 3   CAROLYN MITCHELL,              )
                                    )
 4              Plaintiff,          )
                                    )
 5        vs.                       )
                                    )
 6   ANCHORAGE POLICE DEPARTMENT and)
     the MUNICIPALITY OF ANCHORAGE, a)
 7   municipal corporation, WALTER  )
     MONEGAN, OFFICER HENIKMAN, and )
 8   OFFICER J. VOSS,               )
                                    )
 9              Defendants.         )
     _____)
10   Case No. A05-273 CV (JWS)

11        VIDEOTAPE DEPOSITION OF OFFICER JUSTIN C. VOSS

12   APPEARANCES:

13        FOR THE PLAINTIFF:     MR. MOSHE CALBERG ZOREA
                                 MR. ISAAC D. ZOREA
14                               Attorney at Law
                                 7540 East 17th Avenue
15                               Anchorage, Alaska  99504
                                 (907) 337-7741
16
          FOR THE DEFENDANTS:    MS. JOYCE WEAVER JOHNSON
17                               Assistant Municipal Attorney
                                 632 West 6th Avenue, Suite 730
18                               Anchorage, Alaska  99501
                                 (907) 343-4545
19
          ALSO PRESENT:          MS. CAROLYN MITCHELL
20
                            * * * * * *
21

22

23

24

25
```

R & R COURT REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit D

```
 1  A     The first time that I ever recall contact- --
 2        contacting Ms. Mitchell was reference a reported bank
 3        robbery at the Sears Mall.
 4  Q     Okay.  And what behavior on her part did you observe?
 5  A     I recall that dispatch gave a locate for -- or gave a
 6        description of a pos- -- of the suspect.  I recall that
 7        I was with Officer Henikman, that we set up on one of
 8        the entrances which is on -- pardon me -- the west side
 9        of Sears but the eastern end of the mall, and on the
10        south side of the building.  And that we were there and
11        that Ms. Mitchell came out and I saw that she matched
12        the description of the suspect.  We detained her, and a
13        show up was performed.
14  Q     What part of the description did she match?
15  A     I remember they said she was a heavy set black female
16        wearing blue with sunglasses and bags under her arms.
17  Q     Is that your recollection of what she was wearing?
18  A     That is the recollection of the description that was
19        given and what she matched.  What about her description
20        matched that.
21  Q     So your recollection is she was wearing blue?
22  A     Um-hum.  (Affirmative)
23  Q     What part of her was wearing blue?
24  A     She had -- I think it was a University of North
25        Carolina like jump suit, sweat suit on with a -- she
```

| | | |
|---|---|---|
| 1 | | MS. JOHNSON: I'm going to object to |
| 2 | | argumentative questions and mischaracterizing prior testimony. |
| 3 | Q | That's fine. She can object. Go ahead. |
| 4 | A | You're asking specifically about her actions, but what |
| 5 | | I defined earlier..... |
| 6 | Q | You -- you defined -- right. You defined earlier what |
| 7 | | would give rise to a tarry stop and then you said what |
| 8 | | she did. And I'm asking you if what she did matched |
| 9 | | the requirements of making a tarry stop. Yes? No? |
| 10 | A | Well, that's not a yes or no question. |
| 11 | Q | Oh, it isn't? |
| 12 | A | No, I don't think so. |
| 13 | Q | Okay. How is it not? |
| 14 | A | How is it not is earlier I described that an individual |
| 15 | | fitting within a context, either something did not |
| 16 | | match with that context or something did match with |
| 17 | | that context, was specifically stated about the context |
| 18 | | of a given situation. And her actions are one of many |
| 19 | | different things that could be a suspect or |
| 20 | | individual's actions, or one of a multitude of things |
| 21 | | that could have contexted reasonable suspicion. Just |
| 22 | | their appearance and walking out of a certain location, |
| 23 | | given that there was a bank robbery reported only |
| 24 | | minutes before that and their appearance and their |
| 25 | | distance from that location both matched with what the |

| | | |
|---|---|---|
| 1 | | reported crime had been. That's easily reasonable |
| 2 | | suspicion. Even though all of her specific actions |
| 3 | | were -- the clothing that she had picked to wear that |
| 4 | | day and that she had been walking out of a specific |
| 5 | | exit, that's not the only thing that lends to |
| 6 | | reasonable suspicion. It was her appearance matched |
| 7 | | the description that was given. There was a certain |
| 8 | | time lapse and she was a certain distance from the |
| 9 | | reported location. |
| 10 | Q | Were you able to observe that she was directed out the |
| 11 | | door that you observed her come out of by officers of |
| 12 | | the Anchorage Police Department? |
| 13 | A | I don't know if that happened or not, no. |
| 14 | Q | You don't know? You couldn't see that they were saying |
| 15 | | go out this door? |
| 16 | A | I don't recall if that was happening or not. |
| 17 | Q | Okay. If it was, would that raise a clue in your mind |
| 18 | | that maybe she had passed the threshold test as are as |
| 19 | | your colleagues were concerned? |
| 20 | | MS. JOHNSON: Objection, foundation. |
| 21 | Speculation. | |
| 22 | Q | You don't know? You paid no attention to whether |
| 23 | | someone had directed her to go outside? |
| 24 | A | I -- I can't see inside the -- from where we were I |
| 25 | | couldn't see inside the mall. |

1  Q       Okay.
2  A       So how would I.....
3  Q       So where were you -- where were you in relation to the
4          door that you said you observed her come out of?
5  A       We were positioned south side of the mall, Sears comes
6          out like that and there's like garage doors here. We
7          were close to the southwest corner of the garage door
8          part of Sears.
9  Q       Okay. But were you able to see her come out the door?
10 A       That's correct.
11 Q       Okay. But you say you couldn't not see beyond her
12         through the glass doors?
13 A       Into the mall, no. I don't recall being able to see
14         into the mall.
15 Q       Okay. Then what happened after you saw her? What
16         actions did you take?
17 A       I recall that we both saw her, that we both thought
18         that she matched the description.
19 Q       You were speculating, of course, right?
20              MS. JOHNSON: Objection, argumentative.
21 Q       Were you speculating or do you have a direct link to
22         Officer Henikman's mind?
23              MS. JOHNSON: Objection, foundation,
24 argumentative.
25 Q       You -- you -- what's the basis for you saying we when

| | | |
|---|---|---|
| 1 | | it's you, could you tell me? |
| 2 | A | I can. I'm just waiting for you to stop. I'm sorry. |
| 3 | Q | Yeah. Go ahead. |
| 4 | A | I keep -- I just keep getting interrupted. |
| 5 | Q | Okay. |
| 6 | A | Okay. I recall that we were both out of our vehicles and I -- I recall looking at him and saying I think that might be her, she matches the description or something to that effect. I remember him agreeing. |
| 10 | Q | Okay. So you had direct communication with Officer Henikman? |
| 12 | A | Correct. |
| 13 | Q | How far from Officer Henikman were you in distance? |
| 14 | A | I don't recall specifically. |
| 15 | Q | But close enough to be able to hear that kind of exchange? |
| 17 | A | Correct. |
| 18 | Q | Okay. Okay. So after that verbal interaction between yourself and Officer Henikman, what happened then? What did you do? |
| 21 | A | I recall that I held Ms. Mitchell at guard and that -- I recall that we made verbal contact. I don't recall if I specifically gave her verbal instructions, or he did, or we both did. But I recall that verbal contact was made. That she was given instructions and that we |

|    |   |                                                                         |
|----|---|-------------------------------------------------------------------------|
| 1  |   | took her into custody.                                                  |
| 2  | Q | Okay.  And you pointed your gun at her?                                 |
| 3  | A | That's incorrect.                                                       |
| 4  | Q | Oh, you did not point your gun at her?                                  |
| 5  | A | Correct.                                                                |
| 6  | Q | If she was standing, seeing you, would she perceive                     |
| 7  |   | that a firearm was pointed at her?                                      |
| 8  |   | MS. JOHNSON:  Is that a question?                                       |
| 9  |   | MR. ZOREA:  Yeah.                                                       |
| 10 | A | Well, just like you -- I don't have a mental connection                 |
| 11 |   | with Ms. Mitchell just like I don't have with                           |
| 12 |   | Officer.....                                                            |
| 13 | Q | What -- if you -- first, what firearm did you have?                     |
| 14 |   | What was the firearm?                                                   |
| 15 | A | I had a shot gun.                                                       |
| 16 | Q | Okay.  You had a shot gun.  And how were you holding                    |
| 17 |   | the shot gun?                                                           |
| 18 | A | At a typical guard position which would be -- or what's                 |
| 19 |   | -- I've also heard it call a low ready, which is                        |
| 20 |   | pointed at the ground.                                                  |
| 21 | Q | Did you point it at her hands?                                          |
| 22 | A | No.  I -- no.                                                           |
| 23 | Q | Did you observe Officer Henikman pointing at her hands?                 |
| 24 | A | Point my shot gun at her?                                               |
| 25 | Q | Her hands being pointed at by his shot gun?  You were                   |

```
 1            right next to him, nearby.
 2    A       I don't recall if he had a shot gun or not.  I
 3            don't.....
 4    Q       You don't recall if he had a shot gun?
 5    A       No.
 6    Q       What did he have if he didn't have a shot gun?
 7    A       I don't know.  I don't recall if he had -- there's
 8            several types of firearms that.....
 9    Q       Okay.
10    A       .....we had.
11    Q       You don't -- you don't recall what kind of firearm he
12            had but you do recall what he said about Ms. Mitchell,
13            is that right?
14    A       Correct.
15    Q       Okay.  And you testified just a minute ago that she was
16            taken into custody.
17    A       Correct.
18    Q       Okay.  Why was she taken into custody?
19    A       She was a certain distance away from the place where a
20            crime had been reported, within an amount of time that
21            was reasonable to believe that that distance had been
22            traversed since the crime had been committed and she
23            matched the description of the suspect that was given.
24    Q       Okay.  So your training that you had in the academy and
25            with the field officers afterwards for 54 shifts.....
```

| | | |
|---|---|---|
| 1 | | Took her into custody. What does taking her into |
| 2 | | custody mean? |
| 3 | A | Putting her in hand cuffs. |
| 4 | Q | I see. So you approached her -- are you the one that |
| 5 | | put her in cuffs? |
| 6 | A | I don't -- I don't recall specifically, but I don't |
| 7 | | think that I was. |
| 8 | Q | Okay. Why? Because you wouldn't have done so? |
| 9 | A | No. Because Officer Henikman is the one who after that |
| 10 | | continued the contact with her and so that to me, for |
| 11 | | the most part, says that Officer Henikman probably put |
| 12 | | her into hand cuffs. Probably pat searched her. |
| 13 | | Probably, you know, continued the contact with her. |
| 14 | | That's usually the sequence of events. |
| 15 | Q | Okay. You say probably. Would there be a situation |
| 16 | | where a person would be put into hand cuffs without |
| 17 | | being pat searched? |
| 18 | A | I would say that that's highly unlikely, but it could |
| 19 | | happen. |
| 20 | Q | Okay. And the purpose of the pat search is what? |
| 21 | A | To check for weapons or forms of escape. |
| 22 | Q | Okay. So if he pat searched her, checked for weapons |
| 23 | | and doesn't find any, why would he need to hand cuff |
| 24 | | her? |
| 25 | A | Hand cuffing would probably be the first thing that was |

|    |   |                                                                       |
|----|---|-----------------------------------------------------------------------|
| 1  |   | she was out of -- was leaving my custody or was being                 |
| 2  |   | released.                                                             |
| 3  | Q | Where was your patrol car in relation to where you and                |
| 4  |   | Officer Henikman were?                                                |
| 5  | A | In the same area.                                                     |
| 6  | Q | What does that mean in terms of distance?                             |
| 7  | A | I would say that we were within about 50 feet of there.               |
| 8  |   | But I don't really recall exactly.                                    |
| 9  | Q | What's the problem with you taking her and putting her                |
| 10 |   | in the patrol car?                                                    |
| 11 | A | I don't think that there is a problem with that                       |
| 12 |   | necessarily except that we were going to perform a show               |
| 13 |   | up and show ups are -- we try to perform them, to the                 |
| 14 |   | best of our ability, so that the person is away from                  |
| 15 |   | police vehicles that they -- it's so that they look                   |
| 16 |   | like they are not under arrest or don't look like                     |
| 17 |   | they're the suspect.  Because a lot of time all the red               |
| 18 |   | and blue flashing lights, all the police vehicles, lots               |
| 19 |   | of officers around, have a tendency to make witnesses                 |
| 20 |   | feel that this person has -- is the person.  Not just                 |
| 21 |   | because they kind of look like that, but also because                 |
| 22 |   | there's so many cops, that must be the person.  So it's               |
| 23 |   | part of our training to do our best to make it look                   |
| 24 |   | like they aren't under arrest or aren't being charged                 |
| 25 |   | with the crime, or we don't think that it's necessarily               |

|   |   |   |
|---|---|---|
| 1 |   | the person. You know, the basic instructions are we |
| 2 |   | tell the person, you know, this person for whatever |
| 3 |   | reason we think might be the person but it's also |
| 4 |   | possible that they're not so, you know, you need to |
| 5 |   | take your best look at this person and see if you |
| 6 |   | remember that that's the individual, not because we |
| 7 |   | think that it might be. |
| 8 | Q | And having one person that happened to be black, by |
| 9 |   | herself, standing with hand cuffs on wasn't going to be |
| 10 |   | impermissibly suggestive in your mind? |
| 11 |   | MS. JOHNSON: Objection, foundation, form. |
| 12 | A | Well, it could be. But it's a lot less suggestive than |
| 13 |   | if..... |
| 14 | Q | If she were sitting in the patrol car? |
| 15 | A | If she had gotten out of a patrol car with red and blue |
| 16 |   | flashing lights and there's several cars standing there |
| 17 |   | and officers..... |
| 18 | Q | Was red and blue flashing lights on all this time? |
| 19 | A | I don't recall if they were or not. |
| 20 | Q | Okay. Because -- do you recall that Ms. Mitchell was |
| 21 |   | standing right out there with hand cuffs, people going |
| 22 |   | by on Benson, able to see her in that position? |
| 23 | A | I don't recall specifically exactly where she was |
| 24 |   | standing or -- I don't recall specifically that people |
| 25 |   | at Benson could see her but I would imagine that that |

1  not at issue.
2           MR. ZOREA:  Okay.  You -- you can object.
3  But.....
4           MS. JOHNSON:  Keep to the facts, counsel.
5  Q    What part of that chronology of events is wrong in your
6  mind?
7  A    That you -- you're implying that I don't care how Ms.
8  Mitchell feels.  I think that's what you're implying
9  and I think that that's incorrect.  I think that it
10 would be more to my -- speaking more to my character to
11 say that I just told you that she was placed in a place
12 where it would be -- it lends more to her credit, or to
13 her benefit that people would be less likely to
14 identify her as being the suspect.  I can imagine how
15 she would be much more so than she already is,
16 emotionally distraught, or if you're saying she's
17 emotionally distraught, it would be much more so if she
18 had gotten out of a police car with red and blue
19 flashing lights and several officers standing around
20 and that person -- that witness to the crime said oh,
21 that must be her.  And imagine if she had been taken
22 into custody by federal -- by the Federal Bureau of
23 Investigation, taken down to their building while in
24 custody, spent hours upon hours, because that's how
25 long investigation when somebody is taken into custody

|    |   |                                                                          |
|----|---|--------------------------------------------------------------------------|
| 1  |   | and arrested takes, and then remanded to a federal                       |
| 2  |   | penitentiary where she awaited trail for six months to                   |
| 3  |   | four years or however long it takes.....                                 |
| 4  | Q | Well.....                                                                |
| 5  | A | .....that would be much more emotionally traumatic.                      |
| 6  | Q | Yeah.  But.....                                                          |
| 7  | A | So it speaks to my credit -- can I finish, please?                       |
| 8  | Q | Yeah.                                                                    |
| 9  | A | Thank you.  It speaks to my credit that we did the best                  |
| 10 |   | thing that we could for her at that time.                                |
| 11 | Q | Did it occur to you that she could sit in the vehicle                    |
| 12 |   | until the show up came and then she could get out                        |
| 13 |   | briefly without the flashing lights on and the person                    |
| 14 |   | would be able to say yea or nay about her?                               |
| 15 | A | I don't know if that thought ever crossed my mind or                     |
| 16 |   | not.  But again, I would like to reiterate that Officer                  |
| 17 |   | Henikman had her in custody, I did not.                                  |
| 18 | Q | Okay.  Now you've testified about that before.  At what                  |
| 19 |   | point did you part ways with Officer Henikman?                           |
| 20 | A | We were together at the same place but he took custody                   |
| 21 |   | and continued the contact with her while I stayed with                   |
| 22 |   | my attention more focused on the doors where people                      |
| 23 |   | were still exiting, to watch for other possible                          |
| 24 |   | suspects.  And that was kind of our -- our attention at                  |
| 25 |   | that point was I would say fairly divided.  And I                        |

56

| | | |
|---|---|---|
| 1 | A | I would..... |
| 2 | | MS. JOHNSON: Same objection. |
| 3 | A | I'd say that's what I'm referring to as to why they |
| 4 | | were detained. Why they were placed in the hand cuffs. |
| 5 | Q | So is it fair to say, because you've repeatedly linked |
| 6 | | hand cuffing and detaining. Are the two synonymous |
| 7 | | with you? |
| 8 | A | No. But in this situation they are. I'm sorry, I keep |
| 9 | | getting confused. We keep going from hypothetical back |
| 10 | | to specific. |
| 11 | Q | Well, no. In any case do you -- you seem to tie hand |
| 12 | | cuffing and detaining. So are they -- they go |
| 13 | | together? |
| 14 | A | In this situation they do. She was -- she was detained |
| 15 | | when she was held at guard and then she was immediately |
| 16 | | placed in hand cuffs as soon as practical to do so. So |
| 17 | | that's -- that's like -- the physical representation of |
| 18 | | her being detained in this situation, was the fact that |
| 19 | | she was placed in hand cuffs. |
| 20 | Q | Would you have done that if she was not a black person? |
| 21 | A | Absolutely. |
| 22 | Q | To the best of your recollection how long was she held |
| 23 | | in hand cuffs? |
| 24 | A | I think the best venue for that information would |
| 25 | | probably be the dispatch log. I -- I don't recall |