# EXHIBIT G

1                  IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ALASKA

3   CAROLYN MITCHELL,                )
                                     )
4                   Plaintiff,       )
                                     )
5      vs.                           )
                                     )
6   ANCHORAGE POLICE DEPARTMENT and )
    the MUNICIPALITY OF ANCHORAGE, a)
7   municipal corporation, WALTER    )
    MONEGAN, Officer HENIKMAN and    )
8   Officer J. VOSS,                 )
                                     )
9                   Defendants.      )
    _____ )
10  Case No.  A05-0273 CV (JWS)

11      **VIDEOTAPE DEPOSITION OF OFFICER ROSS HENIKMAN**

12  APPEARANCES:

13      FOR THE PLAINTIFF:          MR. ISAAC D. ZOREA
                                    MR. MOSHE CALBERG ZOREA
14                                  Attorneys at Law
                                    P.O. Box 212043
15                                  Anchorage, Alaska 99521
                                    (907) 337-7741
16

17      FOR THE DEFENDANTS:         MS. JOYCE WEAVER JOHNSON
                                    Assistant Municipal Attorney
18                                  Municipality of Anchorage
                                    632 West Sixth Avenue
19                                   Suite 730
                                    Anchorage, Alaska 99501
20                                  (907) 343-4545

21      ALSO PRESENT:               MS. CAROLYN MITCHELL

22                          * * * * * * *

23

24

25

Exhibit G – Page 1

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

1   Q       How do you distinguish between you personally as a --

2           as a police officer for the Municipality, how do you

3           distinguish between an investigatory stop and an

4           arrest?  What elements distinguish the two?

5   A       Well, to make an arrest I need probable cause.

6   Q       Okay.  Is there any physical -- if -- if I were

7           observing you making an investigatory stop versus an

8           arrest would I observe any distinguishing behavior or

9           any differences between the two?

10  A       It depends on the situation.

11  Q       Okay.  Well, let's say in the case of a suspected bank

12          robbery?

13  A       Could you rephrase your question?

14  Q       Okay.  If you suspected -- if you had heard that a bank

15          robbery had occurred and you observed a person and you

16          decided to do an inv- -- investigatory stop of that

17          person, how would that differ from making an arrest of

18          that person?

19              MS. JOHNSON:  Objection, foundation.

20  Speculation.  There's not enough facts in the question.

21              MR. ZOREA:  Okay.  Well, I can.....

22              MS. JOHNSON:  Go ahead.

23  A       I would stop the individual and inquire if they

24          committed the bank robbery.

25  Q       (By Mr. I. Zorea)  Okay.  And if you were to arrest the

Exhibit G – Page 2

1    person you would have had to have -- what would have

2    had to have occurred before you were to make an arrest

3    of the person.....

4  A    Well, I would have had to obtain information that would

5    lead me to believe that that person may have committed

6    the bank robbery.

7  Q    Okay.  Can you recall what case law you might have

8    studied or what materials you referenced that define

9    what elements were required for an investigatory stop?

10 A    The one that comes to mind would be Terry versus Ohio.

11 Q    Terry versus Ohio.  Any Alaska cases that relate to how

12    the Supreme Court applied Terry versus Ohio?

13 A    Nothing comes to mind.

14              MR. M. ZOREA:  I'm glad you asked for that

15 (indiscernible - away from microphone).

16 Q    During the course of your training did you ever fire --

17    what -- what sorts of weapons did you fire?

18 A    I fired a Glock Model 21 and a Remington 870 shotgun.

19 Q    And after being commissioned as an officer did you

20    carry both of those weapons with you?

21 A    Yes.

22 Q    How frequently have you had to fire the shotgun during

23    training, how many occasions, was it hours or was it

24    rounds that were spent?

25 A    During training it was a certain number of hours.

Exhibit G – Page 3

12

1   Q       How many hours?

2   A       I think it was 40.

3   Q       40 hours, okay.  And how many hours on the Glock?

4   A       I don't recall exact -- the exact number, but it was a

5           lot of hours.

6   Q       More than the shotgun?

7   A       Yes.

8   Q       Regarding the shotgun how much pressure do you have to

9           apply on the trigger of the shotgun to get it to -- to

10          fire?

11  A       I don't know.

12  Q       Is it a lot or a little bit?  Is there a -- is it a

13          traditional trigger you just pull it and it fires, or

14          is there a double locking mechanism of anything of that

15          type?

16  A       I wouldn't be qualified to answer that type of

17          technical question.

18  Q       Even though you fired it 40 -- 40 hours.....

19  A       I pulled -- I pulled the trigger.

20  Q       You just pulled the trigger?

21  A       Yes.  I don't know offhand without referring to

22          reference material the exact poundage on the trigger.

23  Q       Uh-hum.  During those 40 hours was a -- do you recall

24          there being a double locking mechanism on the trigger,

25          pull one and pull it again, or is it just a single?

Exhibit G – Page 4

1  A    It's a standard trigger with a single pull.

2  Q    All right.  Let's reference are you familiar with the

3       events related to this civil suit?

4  A    Yes.

5  Q    And this incident occurred -- is it your recollection

6       this occurred May 8th, 2004?

7  A    Yes.

8  Q    So at that time you had been an officer -- commissioned

9       officer for approximately how long?

10 A    I'd say year and a half.

11 Q    Year and a half.....

12 A    Approximately.

13 Q    During the course of that year and a half had you

14       arrested very many people?

15 A    Yes.

16 Q    Approximately how many?

17 A    I don't know.

18 Q    Have you conducted -- had you conducted very many

19       investigatory stops?

20 A    Yes.

21 Q    Could you explain what occurred on May 8th, 2004 in

22       your words?  How you came to the Sears Mall and what

23       happened when you arrived there?

24 A    I heard a report of a armed bank robbery at the Wells

25       Fargo Bank within inside -- or inside of the Sears

Exhibit G – Page 5

1    Malls.  I responded to the mall.  I set up on the

2    southwest perimeter and maintained a perimeter

3    position.  I heard various radio traffic indicating

4    that there was a possible suspect described as a heavy

5    set Black female with a bag.  As I was on the perimeter

6    watching the southwest exit doors of the mall I

7    observed a Black female that matched the description I

8    heard over the radio.....

9    Q    Uh-hum.

10   A    .....walk out of the doors.  I stopped her, placed her

11        in handcuffs.  I conducted a pat down for weapons.

12        Identified her by her military I.D.  And I stood by

13        with her while a show up was conducted.  The show up

14        produced a negative result and she was released.

15   Q    Breaking that down a little bit, you said you stopped

16        her.  How did you stop her?

17   A    I told her to turn around, face away from me, walk back

18        towards my voice and I placed her in handcuffs.

19   Q    Were you holding any weapons?

20   A    Yes.

21   Q    What weapon?

22   A    A Remington 870 shotgun.

23   Q    What was the -- when she exited the building what was

24        the duration of time between when she exited the

25        building and when you placed her in handcuffs?

Exhibit G – Page 6

| | | |
|---|---|---|
| 1 | A | It was within a minute. |
| 2 | Q | Was she accompanied by any other people? |
| 3 | A | Yes. |
| 4 | Q | And who was with her? |
| 5 | A | Her son. |
| 6 | Q | And how old do you think he was? |
| 7 | A | I don't remember offhand, I think he was 14 or |
| 8 | | thereabouts. |
| 9 | Q | Any other persons come out of the building with her? |
| 10 | A | No. |
| 11 | Q | What did you do regarding the son before you placed |
| 12 | | that plaintiff in handcuffs?  Did you separate them -- |
| 13 | | the suspect from the son? |
| 14 | A | Yes. |
| 15 | Q | And how did you do that? |
| 16 | A | We had him stand to the side. |
| 17 | Q | Was that you that told him to stand to the side? |
| 18 | A | I don't remember. |
| 19 | Q | Your shotgun, where was it pointed? |
| 20 | A | It was held in the guard position. |
| 21 | Q | And what does that mean? |
| 22 | A | That'll be pointed toward the area of the suspect's |
| 23 | | hands. |
| 24 | Q | Okay.  Do you recall where her hands were? |
| 25 | A | I believe she was carrying a bag in one hand. |

Exhibit G – Page 7

1       -- you told her -- told her to turn around?

2    A  Yes.

3    Q  Before you handcuffed her?

4    A  Yes.

5    Q  Now when you told her to turn around do you know what

6       Mister -- Officer Voss was doing, was he still holding

7       her at guard?

8    A  I don't remember.

9    Q  When she turned around what did you do with your

10      weapon, was that still pointed at her?

11   A  Yes.

12   Q  At what point did you lower your weapon and reach for

13      your handcuffs?

14   A  Before I was ready to handcuff her.

15   Q  Okay.  So she backed up -- you said she backed up.  How

16      far did she have to back up to reach where you were,

17      the 15 feet?

18          MS. JOHNSON:  Foundation, speculation.

19   A  I encountered her at 15 feet, so it's within that

20      range.

21   Q  (By Mr. I. Zorea)  At the time you -- or prior to

22      handcuffing her, did Ms. Mitchell resist any of your

23      commands?

24   A  No.

25   Q  Did she seem a flight risk?

Exhibit G – Page 8

1              MS. JOHNSON:  Calls for speculation.

2  A    I don't know.

3  Q    (By Mr. I. Zorea)  Did you -- were you in fear for your

4       safety?

5  A    No.

6  Q    Did you believe she had a weapon?

7  A    I believe she may have had a weapon based on the

8       information I had at the time.

9  Q    At the time.  Prior to arre- -- putting her in

10      handcuffs did you believe she had a weapon on her

11      person?

12             MS. JOHNSON:  Objection, asked and answered.

13  A   I believe it was possible she had a weapon based on the

14      information that I had.

15  Q   Possible she had a weapon on her right then and there?

16  A   Yes.

17  Q   What sort of clothing was she wearing?

18  A   I believe she had on a -- some type of athletic warm-up

19      outfit.

20  Q   Do you recall what sort of shoes she was wearing?

21  A   No.

22  Q   And what sort of bags did she have?  Did she have any

23      bags with her?

24  A   Yes.

25  Q   What sort of bags were those?

Exhibit G – Page 9

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE  ALASKA  99501

1  A    I believe she had some type of shopping bag and a

2       purse.

3  Q    Do you know where the shopping bag was from?

4  A    No.

5  Q    How is it that Miss -- do you know how Ms. Mitchell

6       happened to exit the Sears Mall from where she exited

7       from?

8             MS. JOHNSON:  Objection, foundation,

9  speculation.

10  A    She walked out the door.  Can you clarify wh- -- you

11       question a little further?

12  Q    (By Mr. I. Zorea)  Was -- is it your belief that she

13       exited the door at that location voluntarily or was

14       there -- was she e- -- escorted by the police or

15       directed by the police?

16  A    All I know is that she walked out the door.

17  Q    Okay.

18  A    And that's what I saw.

19  Q    So when she left building you -- left the building you

20       did not see any other police officers behind her?

21  A    No.

22  Q    Did you -- before placing her in handcuffs did you ask

23       her to drop her bags?

24  A    I don't remember.

25  Q    Do you recall whether she backed up towards you with

Exhibit G – Page 10

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE. ALASKA  99501

22

| | | |
|---|---|---|
| 1 | | the bags in her hands or whether you -- on the ground? |
| 2 | A | I don't remember. |
| 3 | Q | What prompted you to place her in handcuffs? |
| 4 | A | I placed her in handcuffs to detain her. |
| 5 | Q | Could you have detained her without placing her in |
| 6 | | handcuffs? |
| 7 | | MS. JOHNSON: Objection, speculation. |
| 8 | A | I could have, yes. |
| 9 | Q | (By Mr. I. Zorea) During your training was there any |
| 10 | | instruction on when it was an appropriate for an |
| 11 | | officer to place somebody in handcuffs? |
| 12 | A | Yes. |
| 13 | Q | And what sort of instruction did you have concerning |
| 14 | | when you could place somebody in handcuffs? |
| 15 | A | It depends on the situation. In..... |
| 16 | Q | (Indiscernible - simultaneous speech)...... |
| 17 | A | .....this particular situation I'd information that a |
| 18 | | armed bank robbery just occurred and someone matching |
| 19 | | the description of the suspect walked out the doors. |
| 20 | | It'd be appropriate for not only my safety, but the |
| 21 | | safety of the public and the safety of that individual |
| 22 | | to be placed in handcuffs. |
| 23 | Q | So is it your testimony that you placed her in |
| 24 | | handcuffs as a safety issue? |
| 25 | A | That's one of the reasons. |

Exhibit G – Page 11

1    Q    Whose safety were you concerned about?

2                  MS. JOHNSON:  Asked and answered.

3    A    I mentioned my safety, the suspect's safety and the

4         safety if the individuals walking around the shopping

5         mall.

6    Q    (By Mr. I. Zorea)  On the inside of the shop- --

7         shopping mall or.....

8    A    Anywhere.

9    Q    Yet you testified earlier that you weren't in fear for

10        your safety though, were you?

11   A    No, I wasn't.  This is what I do for a living.

12   Q    How were you protecting Ms. Mitchell's safety by

13        placing her in handcuffs?

14   A    I was securing her so that -- it's been my experience

15        that a lot of individuals who may be armed may have

16        access to a weapon, while they're secured it eliminates

17        their access to a weapon, reduces any probability of

18        force.

19   Q    After placing her in handcuffs I think you stated that

20        you did a pat down?

21   A    Correct.

22   Q    Okay.  And what -- did the pat down reveal any weapons?

23   A    No.

24   Q    Did you look inside of the purse?

25   A    Yes.

Exhibit G – Page 12

24

| | | |
|---|---|---|
| 1 | Q | Was there a weapon in her purse? |
| 2 | A | No. |
| 3 | Q | Approximately how long did it take for you to pat her |
| 4 | | down and to look in her purse for weapons? |
| 5 | A | I'd estimate 15 seconds. |
| 6 | Q | Do you recall how long Ms. Mitchell was handcuffed? |
| 7 | A | No. |
| 8 | Q | Would you say that it was a matter of minutes or a |
| 9 | | matter of seconds? |
| 10 | A | Minutes. |
| 11 | Q | What was your reasoning for keeping handcuffs on her |
| 12 | | after you had ascertained that no weapons were on her |
| 13 | | person or in her purse? |
| 14 | A | We had officers at the time going around the Sears Mall |
| 15 | | with the teller who was a witness to the bank robbery |
| 16 | | conducting show ups.  And Ms. Mitchell was detained |
| 17 | | until the teller could arrive and view Ms. Mitchell and |
| 18 | | determine if she was or was not the suspect in the bank |
| 19 | | robbery. |
| 20 | Q | Okay.  Did -- didn't really answer my question.  Why |
| 21 | | did you keep the handcuffs on her after determining |
| 22 | | that she didn't have any weapons? |
| 23 | A | She was being detained..... |
| 24 | Q | Okay. |
| 25 | A | .....pending the show up. |

Exhibit G – Page 13

25

| | | |
|---|---|---|
| 1 | Q | Is it required to have a person in detention, it is |
| 2 | | required to keep them in handcuffs, is that a policy -- |
| 3 | | municipal policy? |
| 4 | A | No, it's my decision.  She still could have been the |
| 5 | | bank robber. |
| 6 | Q | During the time that she was handcuffed, do you recall |
| 7 | | if Ms. Mitchell asked if she could make a telephone |
| 8 | | call? |
| 9 | A | I don't remember. |
| 10 | Q | Do you recall if she said she was concerned about her |
| 11 | | son? |
| 12 | A | I believe she did. |
| 13 | Q | Was that concern for her son directed at you or at |
| 14 | | another officer? |
| 15 | A | I don't remember who it was directed at. |
| 16 | Q | And what sort of statements did she make regarding her |
| 17 | | son? |
| 18 | A | I don't remember the exact statements. |
| 19 | Q | Did you give her any assurances as to her son's safety? |
| 20 | A | I don't remember. |
| 21 | Q | Do you recall news camera at any time arrived there on |
| 22 | | the scene where Ms. Mitchell was? |
| 23 | A | I believe the news media eventually showed up at the |
| 24 | | mall.  I wasn't paying attention to what they were |
| 25 | | doing. |

Exhibit G – Page 14

1  Q   Do you have an estimate of how long it took for the
2      bank teller to arrive at the scene to do a show up?
3  A   I would estimate approximately 20 minutes.
4  Q   Twenty minutes.  And during this 20 minutes was Ms.
5      Mitchell in handcuffs the whole time?
6  A   Yes.
7  Q   Was Ms. Mitchell in custody?
8  A   She was being detained.
9  Q   Do you -- do you know what custody is, the term custody
10     means?  Is that a term that they use in the police
11     department?
12 A   Yes.
13 Q   Okay.  What -- what does custody mean?
14 A   My view of custody is when someone is not free to
15     leave.
16 Q   Okay.  So was she in custody?
17 A   Yes.
18 Q   During the time that Ms. Mitchell was detained did you
19     ask her any questions?
20 A   I asked her some basic questions regarding her
21     identity.
22 Q   Did you ask her if she committed the bank robbery?
23 A   No.
24 Q   During the time that she was detained did you believe
25     that you were making an investigatory stop?

Exhibit G – Page 15

27

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what was the purpose of that investigatory stop? |
| 3 | A | To determine if the individual that I stopped was the |
| 4 | | suspect in the bank robbery. |
| 5 | Q | And if that was the purpose why is it that you didn't |
| 6 | | ask her any questions about whether she had committed |
| 7 | | robbery? |
| 8 | A | I'm not going to ask any questions about the crime |
| 9 | | unless I read Miranda. |
| 10 | Q | Oh. |
| 11 | A | Conduct an interview with her. |
| 12 | Q | Okay. |
| 13 | A | That wasn't the purpose of this stop. |
| 14 | Q | Okay.  The purpose was not to conduct an interview of |
| 15 | | her? |
| 16 | A | That's correct.  The purpose was to await a show up |
| 17 | | with the witness. |
| 18 | Q | Okay.  At the time that the witness arrived for the |
| 19 | | show up how many officers do you believe were on the |
| 20 | | scene at that time? |
| 21 | A | I'm not sure exactly how many. |
| 22 | Q | More than just you and..... |
| 23 | A | Yes. |
| 24 | Q | .....Officer Voss?  Can you explain the loc- -- the |
| 25 | | geography of where Ms. Mitchell was held during these |

Exhibit G – Page 16

28

| | | |
|---|---|---|
| 1 | | 20 minutes? |
| 2 | A | She was stopped outside the southwest doors of the |
| 3 | | Sears Mall which lead out to the parking lot. |
| 4 | Q | Were there any roads visible from where she was at? |
| 5 | A | Benson Boulevard would be to the south of the mall. |
| 6 | | Could you see New Seward from where she was at? |
| 7 | A | I believe you could. |
| 8 | Q | What time of day was this occurring? |
| 9 | A | I believe it was approximately 1730. |
| 10 | Q | In laymen term 5:30? |
| 11 | A | 5:30 p.m. |
| 12 | Q | Do you recall if there was any traffic on the Benson or |
| 13 | | New Seward roads? |
| 14 | A | Yes. |
| 15 | Q | Did you make any efforts to keep Ms. Mitchell from |
| 16 | | public view during the time she was in handcuffs? |
| 17 | A | No. |
| 18 | Q | Was there a squad car nearby her? |
| 19 | A | Yes. |
| 20 | Q | Why didn't you put her in the squad car? |
| 21 | A | We were waiting a show up.  It would have been feasible |
| 22 | | in that situation have her stand there until the |
| 23 | | witness arrived. |
| 24 | Q | When you were in communication with the -- with other |
| 25 | | officers who had the witness with them or how - how did |

Exhibit G – Page 17

68

1       your concerns over the safety, was -- were those --

2       when you mentioned -- let's go to concerns about

3       safety, fear that a hostage could be used as a shield,

4       fear that a citizen at the mall could be taken as a

5       hostage, fear that a suspect could approach a vehicle,

6       were those fears that you specifically had concerning

7       Ms. Mitchell?

8  A     I consider those scenarios possible in any type of

9       armed bank robbery?

10  Q    Okay.  Well, let's -- let's reference specifically your

11      appr- -- your assessment of Ms. Mitchell at that time.

12      Did you fear that she would use her son as a hostage

13      and a shield?

14          MS. JOHNSON:  Objection, foundation and

15  speculation.

16  A     It's possible she could.

17  Q    (By Mr. I. Zorea)  Yeah, but I'm not asking possible.

18      I'm asking what was going on in your brain 'cause

19      you're the only one that can tell us what was going on

20      in your brain, you know, what -- what, you know,

21      theories were going through your head, why you did what

22      you did?  We need to know.....

23  A     The theories that.....

24  Q    .....why you did what you did.

25  A     .....were going on in my -- in my brain were that these

Exhibit G – Page 18

69

1       scenarios were possible.  They've happened in other

2       cases in the past.  It's possible it could happen in

3       this one.  I.....

4  Q    Okay.  I'm asking.....

5  A    ....don't know what Ms. Mitchell's capable of.

6       I've.....

7  Q    Okay.

8  A    .....never met her.

9  Q    Okay.  But I'm asking whether or not you believe that

10      she would use her son as a hostage?  Not whether it was

11      possible, I'm asking whether you had a realistic fear

12      that she was going to use her son as a hostage in this

13      situation?

14         MS. JOHNSON:  Objection, relevance,

15 speculation, and foundation.  And the witness has already

16 testified that his fears are not -- it's his procedures that

17 he's telling you.....

18         MR. I. ZOREA:  Okay.

19         MS. JOHNSON:  .....and the practicality.

20         MR. I. ZOREA:  Just so -- you -- you keep on

21 objecting to relevance.  Relevance has -- his credibility has

22 everything to do with relevance.  Her emotional distress has

23 everything to do with -- with -- that's all relevant.  And so,

24 you know, you can object but I'm asking him a question and I

25 expect him to answer, okay.  So you can object for the record

Exhibit G – Page 19

1   and that's fine.  Go.....

2                    MS. JOHNSON:  Done so.

3                    MR. I. ZOREA:  .....right ahead.

4   Q    (By Mr. I. Zorea)  I'm asking you what was in your

5        brain.....

6   A    As I mentioned before I -- I wasn't -- I wasn't in

7        fear.

8   Q    You weren't in fear?

9   A    No (ph).

10  Q    You weren't in fear that she was going to use.....

11  A    I wasn't --.....

12  Q    .....her son as a hostage?

13  A    I wasn't personally in fear, no.

14  Q    Okay.  Were you in fear -- 'cause you mentioned these

15       things on -- on her cross and I -- I want to clarify.

16  A    Uh-hum.

17  Q    Were you in fear that she was going to take a citizen

18       from the mall and use that citizen as a hostage if you

19       had released her from her handcuffs?

20                   MS. JOHNSON:  Same objections.

21  A    I was not in fear.

22  Q    Okay.  Again, were you in fear she was going to

23       approach a vehicle, let's say, on Benson or on New

24       Seward and subdue whoever was in that vehicle and take

25       off from.....

Exhibit G – Page 20

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

1                    MS. JOHNSON:    Same.....

2    Q        .....the scene?

3                    MS. JOHNSON:    Same objection.

4    A        I was not in fear.

5    Q        (By Mr. I. Zorea)  Okay.  Thank you.  Again,

6            specifically, I'm asking specifically what was in your

7            head regarding movement of Ms. Mitchell?  Where did you

8            think an arrest would occur if you had moved -- was

9            there a certain specific geographical distance from you

10           apprehended her or where you put her in detention that

11           you think if you had moved her beyond that that an

12           arrest would have occurred?

13   A        No.

14   Q        Okay.  That wasn't really a concern of yours where you

15           moved her?

16                   MS. JOHNSON:    Objection, misstates the

17   testimony.

18   Q        Well, I'm asking you was that an c- -- an actual

19           concern that if you had moved her a certain distance

20           then she would be arrested rather than just detained?

21   A        I've reviewed case law where that's happened in

22           previous situations.  And I chose not to move her.

23   Q        Okay.  So, again, we're -- we want specific.  When you

24           chose -- when you made the decision not to move her

25           very far from where you handcuffed her, is that

Exhibit G – Page 21