# EXHIBIT H

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3  CAROLYN MITCHELL,                    )
                                        )
4                  Plaintiff,           )
                                        )
5          vs.                          )
                                        )
6  ANCHORAGE POLICE DEPARTMENT and )
   the MUNICIPALITY OF ANCHORAGE, a)
7  municipal corporation, WALTER    )
   MONEGAN, OFFICER HENIKMAN, and  )
8  OFFICER J. VOSS,                    )
                                        )
9                  Defendants.          )
   _____)
10 Case No. A05-273 CV (JWS)

11 __VIDEOTAPE DEPOSITION OF OFFICER JUSTIN C. VOSS__

12 APPEARANCES:

13      FOR THE PLAINTIFF:      MR. MOSHE CALBERG ZOREA
                                MR. ISAAC D. ZOREA
14                              Attorney at Law
                                7540 East 17th Avenue
15                              Anchorage, Alaska  99504
                                (907) 337-7741
16

        FOR THE DEFENDANTS:     MS. JOYCE WEAVER JOHNSON
17                              Assistant Municipal Attorney
                                632 West 6th Avenue, Suite 730
18                              Anchorage, Alaska  99501
                                (907) 343-4545
19

        ALSO PRESENT:           MS. CAROLYN MITCHELL
20
                        *  *  *  *  *  *
21

22

23

24

25

Exhibit H – Page 1
R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

1   A   The first time that I ever recall contact- --

2       contacting Ms. Mitchell was reference a reported bank

3       robbery at the Sears Mall.

4   Q   Okay.  And what behavior on her part did you observe?

5   A   I recall that dispatch gave a locate for -- or gave a

6       description of a pos- -- of the suspect.  I recall that

7       I was with Officer Henikman, that we set up on one of

8       the entrances which is on -- pardon me -- the west side

9       of Sears but the eastern end of the mall, and on the

10      south side of the building.  And that we were there and

11      that Ms. Mitchell came out and I saw that she matched

12      the description of the suspect.  We detained her, and a

13      show up was performed.

14  Q   What part of the description did she match?

15  A   I remember they said she was a heavy set black female

16      wearing blue with sunglasses and bags under her arms.

17  Q   Is that your recollection of what she was wearing?

18  A   That is the recollection of the description that was

19      given and what she matched.  What about her description

20      matched that.

21  Q   So your recollection is she was wearing blue?

22  A   Um-hum.  (Affirmative)

23  Q   What part of her was wearing blue?

24  A   She had -- I think it was a University of North

25      Carolina like jump suit, sweat suit on with a -- she

Exhibit H – Page 2

12

1  had a blue shirt underneath that.

2  Q  Okay.  When you first observed her was there anything

3  out of -- out of whack about how she was acting?

4  A  Can you define out of whack?

5  Q  Well, you've testified as to the basis for a tarry

6  stop.

7  A  Um-hum.

8  Q  You said that certain things could happen which would

9  give you a basis to engage in a tarry stop.

10  A  Um-hum.

11  Q  So the question is what, if anything, did Ms. Mitchell

12  do that made you believe that you could stop her?

13  A  Are you asking about the situation as a whole or just

14  specifically about her actions?

15  Q  Just her actions?

16  A  Just her actions?

17  Q  Yes.

18  A  The only action that she took that I can recall that

19  led to the reasonable suspicion was that she was

20  walking out or exiting the Sears Mall.  That's the only

21  action that she had taken.

22  Q  Okay.  So looking at the definition you gave of what

23  you had to do in order to do a tarry stop, isn't it

24  fair to say there wasn't any behavior that would

25  trigger that?

Exhibit H.– Page 3

1    MS. JOHNSON:  I'm going to object to
2  argumentative questions and mischaracterizing prior testimony.
3  Q    That's fine.  She can object.  Go ahead.
4  A    You're asking specifically about her actions, but what
5       I defined earlier.....
6  Q    You -- you defined -- right.  You defined earlier what
7       would give rise to a tarry stop and then you said what
8       she did.  And I'm asking you if what she did matched
9       the requirements of making a tarry stop.  Yes?  No?
10 A    Well, that's not a yes or no question.
11 Q    Oh, it isn't?
12 A    No, I don't think so.
13 Q    Okay.  How is it not?
14 A    How is it not is earlier I described that an individual
15      fitting within a context, either something did not
16      match with that context or something did match with
17      that context, was specifically stated about the context
18      of a given situation.  And her actions are one of many
19      different things that could be a suspect or
20      individual's actions, or one of a multitude of things
21      that could have contexted reasonable suspicion.  Just
22      their appearance and walking out of a certain location,
23      given that there was a bank robbery reported only
24      minutes before that and their appearance and their
25      distance from that location both matched with what the

Exhibit H – Page 4

14

1   reported crime had been.  That's easily reasonable

2   suspicion.  Even though all of her specific actions

3   were -- the clothing that she had picked to wear that

4   day and that she had been walking out of a specific

5   exit, that's not the only thing that lends to

6   reasonable suspicion.  It was her appearance matched

7   the description that was given.  There was a certain

8   time lapse and she was a certain distance from the

9   reported location.

10  Q   Were you able to observe that she was directed out the

11      door that you observed her come out of by officers of

12      the Anchorage Police Department?

13  A   I don't know if that happened or not, no.

14  Q   You don't know?  You couldn't see that they were saying

15      go out this door?

16  A   I don't recall if that was happening or not.

17  Q   Okay.  If it was, would that raise a clue in your mind

18      that maybe she had passed the threshold test as are as

19      your colleagues were concerned?

20          MS. JOHNSON:  Objection, foundation.

21  Speculation.

22  Q   You don't know?  You paid no attention to whether

23      someone had directed her to go outside?

24  A   I -- I can't see inside the -- from where we were I

25      couldn't see inside the mall.

Exhibit H – Page 5

1  Q    Okay.

2  A    So how would I.....

3  Q    So where were you -- where were you in relation to the

4       door that you said you observed her come out of?

5  A    We were positioned south side of the mall, Sears comes

6       out like that and there's like garage doors here.  We

7       were close to the southwest corner of the garage door

8       part of Sears.

9  Q    Okay.  But were you able to see her come out the door?

10 A    That's correct.

11 Q    Okay.  But you say you couldn't not see beyond her

12      through the glass doors?

13 A    Into the mall, no.  I don't recall being able to see

14      into the mall.

15 Q    Okay.  Then what happened after you saw her?  What

16      actions did you take?

17 A    I recall that we both saw her, that we both thought

18      that she matched the description.

19 Q    You were speculating, of course, right?

20           MS. JOHNSON:  Objection, argumentative.

21 Q    Were you speculating or do you have a direct link to

22      Officer Henikman's mind?

23           MS. JOHNSON:  Objection, foundation,

24 argumentative.

25 Q         You -- you -- what's the basis for you saying we when

Exhibit H – Page 6

16

1       it's you, could you tell me?

2  A   I can.  I'm just waiting for you to stop.  I'm sorry.

3  Q   Yeah.  Go ahead.

4  A   I keep -- I just keep getting interrupted.

5  Q   Okay.

6  A   Okay.  I recall that we were both out of our vehicles

7       and I -- I recall looking at him and saying I think

8       that might be her, she matches the description or

9       something to that effect.  I remember him agreeing.

10  Q   Okay.  So you had direct communication with Officer

11      Henikman?

12  A   Correct.

13  Q   How far from Officer Henikman were you in distance?

14  A   I don't recall specifically.

15  Q   But close enough to be able to hear that kind of

16      exchange?

17  A   Correct.

18  Q   Okay.  Okay.  So after that verbal interaction between

19      yourself and Officer Henikman, what happened then?

20      What did you do?

21  A   I recall that I held Ms. Mitchell at guard and that --

22      I recall that we made verbal contact.  I don't recall

23      if I specifically gave her verbal instructions, or he

24      did, or we both did.  But I recall that verbal contact

25      was made.  That she was given instructions and that we

Exhibit H – Page 7

1    took her into custody.

2  Q   Okay.  And you pointed your gun at her?

3  A   That's incorrect.

4  Q   Oh, you did not point your gun at her?

5  A   Correct.

6  Q   If she was standing, seeing you, would she perceive

7    that a firearm was pointed at her?

8         MS. JOHNSON:  Is that a question?

9         MR. ZOREA:  Yeah.

10  A   Well, just like you -- I don't have a mental connection

11    with Ms. Mitchell just like I don't have with

12    Officer.....

13  Q   What -- if you -- first, what firearm did you have?

14    What was the firearm?

15  A   I had a shot gun.

16  Q   Okay.  You had a shot gun.  And how were you holding

17    the shot gun?

18  A   At a typical guard position which would be -- or what's

19    -- I've also heard it call a low ready, which is

20    pointed at the ground.

21  Q   Did you point it at her hands?

22  A   No.  I -- no.

23  Q   Did you observe Officer Henikman pointing at her hands?

24  A   Point my shot gun at her?

25  Q   Her hands being pointed at by his shot gun?  You were

Exhibit H – Page 8

R & R COURT REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

1      right next to him, nearby.

2  A    I don't recall if he had a shot gun or not.  I

3      don't.....

4  Q    You don't recall if he had a shot gun?

5  A    No.

6  Q    What did he have if he didn't have a shot gun?

7  A    I don't know.  I don't recall if he had -- there's

8      several types of firearms that.....

9  Q    Okay.

10  A    .....we had.

11  Q    You don't -- you don't recall what kind of firearm he

12      had but you do recall what he said about Ms. Mitchell,

13      is that right?

14  A    Correct.

15  Q    Okay.  And you testified just a minute ago that she was

16      taken into custody.

17  A    Correct.

18  Q    Okay.  Why was she taken into custody?

19  A    She was a certain distance away from the place where a

20      crime had been reported, within an amount of time that

21      was reasonable to believe that that distance had been

22      traversed since the crime had been committed and she

23      matched the description of the suspect that was given.

24  Q    Okay.  So your training that you had in the academy and

25      with the field officers afterwards for 54 shifts.....

Exhibit H – Page 9

1  A    Um-hum.

2  Q    .....taught you that under those circumstances you take

3       the person into custody?

4  A    Correct.

5  Q    Okay. Did they indicate to you that there was any

6       criteria other than what you've testified to that was

7       needed in order to take somebody into custody?

8           MS. JOHNSON: Objection, foundation.

9  Mischaracterizes the testimony.

10 Q    Okay. Is there anything else that you were trained

11      that was necessary in order to take someone into

12      custody?

13 A    I'm not sure if I understand the question.

14 Q    Well, you've testified as to what preceded her being

15      taken into custody and I'm asking whether that was --

16      what you testified was done was all that was needed in

17      order to take somebody into custody?

18 A    I -- well, there's reasonable suspicion and I -- I've

19      seen the levels of evidence describe those kind of

20      straight line continuum where a preponderance of the

21      evidence is 51 percent. Proof beyond a reasonable

22      doubt is way up here like 95 percent maybe, or

23      something to that effect. And reasonable suspicion is

24      down here. And I think what you're asking is did the

25      three things that I saw add up to that, or could there

Exhibit H – Page 10

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

be other things that added up to reasonable suspicion?
Is that what you're asking?

Q    Is there anything else required other than that?

A    Well, there's -- I mean there -- there's various multitude of different things that can equal reasonable suspicion but what I have described easily meets the level of reasonable suspicion.  But it could be other things.  Does it have to specifically be description, time from -- or time lapse since the incident occurred, and distance?  It could be other things.  But those three criteria and the situation easily met with the suspicion in my opinion.

Q    Okay.  And what does this reasonable suspicion that you're talking about result in as far as the person who's the object of your attention?  What is the resulting happening to them at that moment?

A    That they're detained.

Q    Okay.  What does detained mean?  They're told to stay over there or what?

A    Well, basically detention means that a person's right to move freely about is taken.

Q    That's why you have the shot gun, is that right?

MS. JOHNSON:  Objection, foundation.

Q    Is that right?  You've already testified you had the shot gun and you've got it there.  And is it loaded?

Exhibit H – Page 11

21

1  A    Correct.

2  Q    And if someone were to leave after you've detained them

3      you go bang-bang, right?

4  A    Incorrect.

5  Q    No?  What would you do?

6  A    That would be considered a foot chase at that point.

7  Q    So actually the gun was irrelevant, is that right?

8           MS. JOHNSON:  Objection, form.

9  Q    I mean it'd be a foot chase.  You'd be running after

10     them but you're not going to shoot anybody, is that

11     what you're saying?

12  A    If at that point Ms. Mitchell had run and I had given

13     chase on foot, I would not have shot her.

14  Q    You would not.....

15  A    Is that what you're asking?

16  Q    Yes.

17  A    Okay.

18  Q    And you're saying you wouldn't shoot her, you just had

19     the gun there and you'd run with the gun?

20  A    For the action of running away, I don't think that that

21     meets the level of lethal force.

22  Q    I agree.  Okay.  Who was with Ms. Mitchell when she

23     came out of the store?

24  A    She was with a large group of people.  They were all

25     coming out of the mall at that time.

Exhibit H – Page 12

| | | |
|---|---|---|
| 1 | Q | Okay. And did they all just kind of stand around her |
| 2 | | while you were doing the detaining? |
| 3 | A | They continued to move. I believe we gave them |
| 4 | | instructions to move away from where we were. To keep |
| 5 | | moving on. |
| 6 | Q | Did you point the gun at them and tell them to move? |
| 7 | A | No. |
| 8 | Q | Okay. You just -- what'd you do, just say move aside |
| 9 | | or..... |
| 10 | A | Yeah. Please keep moving, please get out of the way, |
| 11 | | or..... |
| 12 | Q | Did they all move away from Ms. Mitchell? |
| 13 | A | That I can recall. I don't recall specifically. |
| 14 | Q | Is it possible that she might have had her young son |
| 15 | | with her? |
| 16 | A | Um-hum. It's possible. |
| 17 | Q | And is it possible that he may have wanted to stay next |
| 18 | | to his mother? |
| 19 | A | That's possible. I don't know. |
| 20 | Q | Do you remember? |
| 21 | A | I remember him being there. I don't remember |
| 22 | | specifically what he said or..... |
| 23 | Q | Okay. Was the description of the bank robber |
| 24 | | consistent with a mother and child? |
| 25 | | MS. JOHNSON: Objection, form. |

Exhibit H – Page 13

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

1   Q    Did they say watch out for mother and child leaving the
2        store?
3   A    The locate that was there had nothing to do -- didn't
4        mention anything about a child or if the suspect was a
5        mother.
6   Q    Okay.  But this suspect, Ms. Mitchell, had a child?
7   A    Correct.
8   Q    So what did that do to the reasonable suspicion index?
9             MS. JOHNSON:  Objection, form.
10  A    I don't think it effected it at all.
11  Q    Okay.  All right.  So what happened?  There you are.
12       You're assisting Officer Henikman, I understand.  And
13       there is a young man there who you believe is -- or you
14       agree is the son of Ms. Mitchell.  What did you do?
15       What did you do with the young man?
16  A    I -- I can't recall specifically.
17  Q    Did Ms. Mitchell make any acts that appeared to be
18       threatening in any way?
19  A    At what point?
20  Q    Any point?
21  A    I don't recall that she did, no.
22  Q    Well, my understanding is that she comes out, the other
23       people are dispersed away.  Did that leave two people
24       that were there left to deal with, Ms. Mitchell and her
25       son?

24

1  A    I believe so.

2  Q    And Ms. Mitchell had not made any threatening gestures?

3  A    No.

4  Q    Okay.  So then what did you do, or what happened in

5       your vision?  What did you see happen?

6  A    After what point.  We're going -- going back and forth.

7       I'm just not sure what.....

8  Q    The people are -- the people are gone.

9  A    Um-hum.

10 Q    The only people there are Ms. Mitchell and her son.

11      Well, then what happened?

12 A    After she -- are you asking after she was taken into

13      custody or.....

14 Q    Well, no, no.  Right --when they first came out, you

15      spread those others away.

16 A    Um-hum.

17 Q    And there are left Ms. Mitchell and her son.  So what

18      actions did you or your cohort take at that point?

19 A    At that point Officer Henikman and I gave verbal

20      commands to Ms. Mitchell.  I don't recall specifically

21      what they were but most likely they were to keep her

22      hands up and face away from us.  Maybe put down any

23      objects that she had.  And then we took her into

24      custody by placing hand cuffs on her and.....

25 Q    Okay.  So you've got it all kind of lumped together.

Exhibit H – Page 15

R & R  C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE. ALASKA  99501

| | | |
|---|---|---|
| 1 | | Took her into custody.  What does taking her into |
| 2 | | custody mean? |
| 3 | A | Putting her in hand cuffs. |
| 4 | Q | I see.  So you approached her -- are you the one that |
| 5 | | put her in cuffs? |
| 6 | A | I don't -- I don't recall specifically, but I don't |
| 7 | | think that I was. |
| 8 | Q | Okay.  Why?  Because you wouldn't have done so? |
| 9 | A | No.  Because Officer Henikman is the one who after that |
| 10 | | continued the contact with her and so that to me, for |
| 11 | | the most part, says that Officer Henikman probably put |
| 12 | | her into hand cuffs.  Probably pat searched her. |
| 13 | | Probably, you know, continued the contact with her. |
| 14 | | That's usually the sequence of events. |
| 15 | Q | Okay.  You say probably.  Would there be a situation |
| 16 | | where a person would be put into hand cuffs without |
| 17 | | being pat searched? |
| 18 | A | I would say that that's highly unlikely, but it could |
| 19 | | happen. |
| 20 | Q | Okay.  And the purpose of the pat search is what? |
| 21 | A | To check for weapons or forms of escape. |
| 22 | Q | Okay.  So if he pat searched her, checked for weapons |
| 23 | | and doesn't find any, why would he need to hand cuff |
| 24 | | her? |
| 25 | A | Hand cuffing would probably be the first thing that was |

Exhibit H – Page 16

26

1    done.

2  Q  Oh, it was done before the checking for weapons?

3  A  Correct.

4  Q  Okay.  So she was under arrest, bang, and then.....

5          MS. JOHNSON:  Objection.

6  Q  .....patted for weapons?

7          MS. JOHNSON:  Foundation.

8  Q  Is that right?

9          MS. JOHNSON:  Misstates the testimony.

10  Q  Okay.  So the first thing he does is he walks up and

11    hand cuffs her and then pats her, or pats her first?

12  A  Like I said, I can't -- I can't specifically remember

13    what Officer Henikman did.

14  Q  Okay.

15  A  I'm telling you that the natural or normal course of

16    action through training is that somebody is placed in

17    the hand cuffs and then they're pat searched.  That's

18    how we're trained in order to -- or, you know, what

19    order to do that.

20  Q  Okay.  And yet Officer, you just testified that the

21    reason you put them in cuffs is so that you can

22    eliminate the threat of anything against you or anyone

23    else, is that right?

24          MS. JOHNSON:  Object to form.

25  Q  Is that true?

Exhibit H – Page 17

1   A   That's not the only reason.

2   Q   Well, what other reason would you have for hand cuffing

3       her?

4   A   To prevent escape.

5   Q   Escape?  She couldn't run with hand cuffs on?

6   A   Well, are you asking specifically about.....

7   Q   I'm -- all my questions, Officer, please be -- so I --

8       I'm clear, they're all related to this lady on that day

9       at Sears.  Every single one of them.....

10  A   Okay.

11  Q   .....related to that.

12  A   You just keep saying hand cuff them, do this to them.

13  Q   Yeah.

14  A   Are you referring to.....

15  Q   Because.....

16  A   .....Ms. Mitchell specifically or.....

17  Q   Well, I am.  And.....

18  A   All right.

19  Q   Because you had indicated a particular procedure with

20      her with no weapon found, or if there was no weapon,

21      why would she be hand cuffed?

22  A   It's a form that we were taught to use as a form of

23      detention in order to keep somebody detained in one

24      place and to keep both themselves and the officers and

25      the public in general safe.

Exhibit H – Page 18

30

| | | |
|---|---|---|
| 1 | | you deal with others as well.  Correct me if I'm wrong. |
| 2 | A | I just -- I don't understand the question.  You keep |
| 3 | | referring -- the questions are hypothetical in nature |
| 4 | | and then when I answer you you're telling me that it's |
| 5 | | specifically what happened to Ms. Mitchell.  And I |
| 6 | | don't..... |
| 7 | Q | Well, what's your training?  You testified reasonable |
| 8 | | suspicion, detain, take them into custody.  Is that the |
| 9 | | chronology of events? |
| 10 | | MS. JOHNSON:  Objection, misstates the |
| 11 | | testimony.  Form. |
| 12 | Q | Is that the chronology of events that you have just |
| 13 | | testified to today? |
| 14 | A | I don't..... |
| 15 | Q | Okay.  What is your -- you've already given us a |
| 16 | | definition of reasonable suspicion.  So what happens |
| 17 | | after reasonable suspicion? |
| 18 | A | What I just described.  She was detained by hand cuffs |
| 19 | | being placed on her. |
| 20 | Q | Okay. |
| 21 | A | We held her in custody and we -- for furtherance of the |
| 22 | | investigation for -- I don't remember exactly how long |
| 23 | | it was but in order that we could -- so that we could |
| 24 | | further the investigation by performing a show up. |
| 25 | Q | Okay.  So that's what I was asking you.  What you just |

Exhibit H – Page 19

31

1   testified to, that is what you were trained to believe
2   is correct, is that right?
3   A   Well, I.....
4   Q   Or were you doing something that you were not trained
5   to do?
6           MS. JOHNSON:  Objection, foundation.  Form and
7   argumentative.
8   Q   Okay.  Were you trained to do what you just said the
9   chronology was, or were you just doing it for the heck
10  of it?
11  A   The events I just described.....
12  Q   Yes.
13  A   .....were consistent with my training.
14  Q   Okay.  Thank you.  That's what I was asking.  Okay.  So
15  a person is hand cuffed, and were you trained as to
16  what you do with a hand cuffed person?
17  A   Yes.
18  Q   Okay.  What was the training that you received about
19  what you do with the hand cuffed person?
20  A   Again, are we talking hypothetically about anybody
21  that's hand cuffed or.....
22  Q   Well, we'll speak about Ms. Mitchell.  What were you to
23  do with her?
24  A   I didn't continue the contact with Ms. Mitchell.
25  Officer Henikman did.

Exhibit H – Page 20

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

```
 1        was possible.
 2   Q    And so big deal, right?
 3             MS. JOHNSON:  Objection to.....
 4   Q    That's all right?
 5             MS. JOHNSON:  .....form.
 6   Q    Is that -- is that what you're saying, it's perfectly
 7        fine to have her be isolated and hand cuffed in front
 8        of the public when you have not had any probable cause
 9        to arrest her?
10             MS. JOHNSON:  Same objection.
11   A    I would say that procedurally speaking there is nothing
12        wrong with that.
13   Q    Nothing wrong with that.  Okay.
14   A    Procedurally speaking, no.
15   Q    Okay.  This is your training again?
16   A    Correct.
17   Q    Do you have any history, background, did you ever take
18        any courses in history?
19   A    I had some history in high school.
20   Q    Remember in Nazi Germany that's what they used to do,
21        the same thing.  And they thought it was fine.
22        Remember that training?
23             MS. JOHNSON:  Objection, form.
24   A    No.
25   Q    Just detain people, cuff them, put them out there for
```

Exhibit H – Page 21

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

1    people to watch them cuffed and you don't see any
2    problem?
3              MS. JOHNSON:  Objection, form, relevance.
4  Q  Is that right?
5              MS. JOHNSON:  Argumentative.
6  A  Are you asking if my intent was to put her on public
7    display in hand cuffs?
8  Q  My question is did you -- could you care less whether
9    you did?
10             MS. JOHNSON:  Objection, argumentative.....
11 A  I didn't say that either.
12             MS. JOHNSON:  .....form.
13 Q  I mean based on your testimony, Officer, is it fair to
14   say that in your mind, once you have reasonable
15   suspicion, that you're going to detain them, you're
16   going to cuff them and you're going to keep them out in
17   front of God and everybody for observation, and it
18   doesn't.....
19             MS. JOHNSON:  Same objection.
20 Q  .....you at all?
21             MS. JOHNSON:  Same objection.
22 A  I didn't say that either.
23             MS. JOHNSON:  Objection to.....
24 Q  What part didn't you say?
25             MS. JOHNSON:  The feelings of the officer are

47

1  not at issue.

2                MR. ZOREA:  Okay.  You -- you can object.

3  But.....

4                MS. JOHNSON:  Keep to the facts, counsel.

5  Q    What part of that chronology of events is wrong in your

6       mind?

7  A    That you -- you're implying that I don't care how Ms.

8       Mitchell feels.  I think that's what you're implying

9       and I think that that's incorrect.  I think that it

10      would be more to my -- speaking more to my character to

11      say that I just told you that she was placed in a place

12      where it would be -- it lends more to her credit, or to

13      her benefit that people would be less likely to

14      identify her as being the suspect.  I can imagine how

15      she would be much more so than she already is,

16      emotionally distraught, or if you're saying she's

17      emotionally distraught, it would be much more so if she

18      had gotten out of a police car with red and blue

19      flashing lights and several officers standing around

20      and that person -- that witness to the crime said oh,

21      that must be her.  And imagine if she had been taken

22      into custody by federal -- by the Federal Bureau of

23      Investigation, taken down to their building while in

24      custody, spent hours upon hours, because that's how

25      long investigation when somebody is taken into custody

Exhibit H – Page 23

48

1  and arrested takes, and then remanded to a federal

2  penitentiary where she awaited trail for six months to

3  four years or however long it takes.....

4  Q  Well.....

5  A  .....that would be much more emotionally traumatic.

6  Q  Yeah.  But.....

7  A  So it speaks to my credit -- can I finish, please?

8  Q  Yeah.

9  A  Thank you.  It speaks to my credit that we did the best

10  thing that we could for her at that time.

11  Q  Did it occur to you that she could sit in the vehicle

12  until the show up came and then she could get out

13  briefly without the flashing lights on and the person

14  would be able to say yea or nay about her?

15  A  I don't know if that thought ever crossed my mind or

16  not.  But again, I would like to reiterate that Officer

17  Henikman had her in custody, I did not.

18  Q  Okay.  Now you've testified about that before.  At what

19  point did you part ways with Officer Henikman?

20  A  We were together at the same place but he took custody

21  and continued the contact with her while I stayed with

22  my attention more focused on the doors where people

23  were still exiting, to watch for other possible

24  suspects.  And that was kind of our -- our attention at

25  that point was I would say fairly divided.  And I

Exhibit H – Page 24

49

1        stayed there to act as a cover officer while he

2        basically a cover officer to make sure that the area

3        is, like I described, as being operationally safe for

4        the other officer to do his work -- while Officer

5        Henikman was doing that work.  I believe I was there

6        until after the show up was performed and Ms. Mitchell

7        was released and I then went into the bank itself to do

8        uniform investigation.

9  Q     Do you -- and I understand you have lots of cases that

10      you work on, but do you ever follow up to see what

11      happened in a case like that.....

12          MS. JOHNSON:  A case like what?

13  Q     .....as far as.....

14          MS. JOHNSON:  Objection, foundation.

15  Q     .....a bank robbery case as to whether your fellow

16      officers arrested the person who was suspected of

17      robbing the bank?

18  A     Are you asking if I do the follow up myself or if

19      I.....

20  Q     Out of curiosity or whatever.  I mean here you were and

21      all this happened.  Did you wonder what happened about

22      the suspect?  Did they catch a person?

23  A     Sure.  We -- I'm actually relatively certain that we

24      arrested somebody -- I think it was at Third and Eagle,

25      or somewhere around there.  Somewhere in the kind of

Exhibit H – Page 25

1        northern Fairview area.  I think it was later in that

2        shift actually we arrested him.

3    Q    The actual person?

4    A    I believe so.

5    Q    Would you be surprised, Officer, that when they walked

6        up to that actual person, identified him, all the marks

7        of identify with what had been told by the teller, that

8        they did not detain, cuff, take into custody that

9        person?

10   A    Would I be surprised if that happened?

11   Q    Yeah.

12   A    No.

13   Q    Would you say that the difference was the relative

14       years and grade of the officers that made the

15       difference, or what?

16   A    I would say that the -- you know, and again I can't

17       speak to their minds and intent, but to me it would say

18       that the relative distance was the time lapse from the

19       occurrence of the crime and the distance from the

20       occurrence of the crime.

21   Q    So that would cause them not to detain them, but

22       instead to actually find out whether they were a

23       suspect by asking questions and then going forward,

24       making the determination?

25           MS. JOHNSON:  Objection, form, foundation.

Exhibit H – Page 26

51

1    Q    Is that -- is that what the difference would be?

2    A    I don't know what they did.

3    Q    Okay.

4    A    If that's what you're asking I don't know what they

5         did.

6    Q    But you wouldn't be surprised that they might have

7         actually caught the person who was the perpetrator but

8         didn't go through your procedure of detain, take into

9         custody, cuff?

10   A    It wouldn't surprise me that they did something

11        different than Office Henikman and I did.

12   Q    Now that you've had a couple of years more training as

13        an officer, do you have any second thoughts about what

14        your behavior was in May of 2004?

15   A    Reference to this incident?

16   Q    Yes.

17   A    Absolutely not.

18   Q    Okay.  So you still believe, and you haven't had

19        anything change your thinking that what you did was

20        correct?

21   A    I -- can you repeat your question?  I'm sorry.

22   Q    Do you still believe -- you're saying that you believe

23        that all your actions were correct?

24   A    I believe that the actions that I took were almost

25        completely perfect textbook police procedure.

Exhibit H – Page 27

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

52

| | | |
|---|---|---|
| 1 | Q | And the textbook, is this the one prepared by the |
| 2 | | Municipality of Anchorage for the Anchorage Police |
| 3 | | Academy? |
| 4 | A | I'm sorry, I'm not referring to a specific textbook. |
| 5 | | I'm using that as a term of reference.  I believe that |
| 6 | | it was absolutely perfectly..... |
| 7 | Q | By the book? |
| 8 | A | So to speak, by the book. |
| 9 | Q | Okay.  After this incident at any time did anyone in |
| 10 | | your chain of command, or Chief Monegan himself, speak |
| 11 | | to you concerning the incident involving Ms. Mitchell? |
| 12 | A | Are you asking me in..... |
| 13 | Q | Did they question you about your behavior on that day |
| 14 | | in May 2004? |
| 15 | A | I remember -- well, I can't remember specifically.  I |
| 16 | | think that I probably talked to the sergeant about it. |
| 17 | | I remember when I heard that there was going to be a |
| 18 | | lawsuit filed that we kind of spoke about it briefly. |
| 19 | | But I haven't been disciplined or -- if you're asking |
| 20 | | if I've been disciplined, I haven't been disciplined if |
| 21 | | that what you're asking. |
| 22 | Q | Were -- were you spoken to in a way maybe fine tuning |
| 23 | | your officer authorial (sic) skills as to how you would |
| 24 | | conduct yourself in similar circumstances in the |
| 25 | | future? |

Exhibit H – Page 28

R  &  R    C O U R T    R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982