Joyce Weaver Johnson
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
E-mail: uslit@muni.org

Attorney for Defendants
Municipality of Anchorage
Anchorage Police Department
Walt Monegan
Officers Voss and Henikman

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CAROLYN MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT and | ) |
| the MUNICIPALITY OF ANCHORAGE, a | ) |
| municipal corporation, WALTER MONEGAN, | ) |
| Officer HENIKMAN, and Officer J. VOSS, | ) |
| | ) |
| Defendants. | ) Case No. 3:05-cv-00273-JWS |
| | ) |

## DEFENDANTS' REPLY TO RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Oddly, Plaintiff does not use her Response to respond to most of Defendants' controlling case law. Instead, she argues undisputed facts; makes emotional appeals with dramatic language unsupported by evidence of record; and, in one case, sets up a

litigation "theory" which she attributes, incorrectly, to Defendants, before proceeding to knock it down.

The controlling case is *Gallegos*, not *Dunaway*, which addressed a different issue (probable cause) on very different facts.   Most of the facts alleged by Plaintiff are undisputed, and do not require her argument to this Court.  As Defendants noted in their own Opposition to Plaintiff's Motion for Partial Summary Judgment, emotional appeals[1] have no place in asking this Court to make rulings of law.  Finally, if Plaintiff has no better response to Defendants' Motion for Summary Judgment on the Constitutional claims, than to attribute to Defendants a theory they have never espoused, only to shoot it down again, then it is clear Defendants are entitled to their summary judgment.

## A.    *Civil Rights Claims.*

### 1.    *Plaintiff Fails to Answer Controlling Precedent, Gallegos v. Los Angeles.*

Throughout Plaintiff's thoughtfully written brief, not once does she attempt to respond to the facts and outcome that the Ninth Circuit recently decided in *Gallegos v. City of Los Angeles*, 308 F.3d 987 (9th Cir. 2002.) Instead, Plaintiff totally avoids *Gallegos* and Defendants' arguments based on it, (Defendants' Motion at 6 *et seq*.,) and instead relies on *Dunaway*, a case that not only is almost 30 years old, but also is far off point regarding the instant dispute.  *Dunaway* is a criminal case regarding a motion to suppress a confession that police obtained after an improper arrest.  *Dunaway v. New York*, 442 U.S. 200 (1979).  The Supreme Court used *Dunaway* to answer the question

---

[1] *E.g.*, "a nightmarish encounter," "watched in mute helplessness," page 2 of Response; "no fear" for the officers' safety, page 7 of Response.

whether the police can use confessions made during interrogation of suspects who were arrested without probable cause. "We decide in this case the question reserved 10 years ago in *Morales v. New York*, 396 U.S. 102, (1969), namely, 'the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest.'" *Dunaway*, 442 U.S. at 202. Furthermore, the factual situation present in *Dunaway* bears no resemblance to the present case, except for the fact that police officers were involved.

On the other hand, *Gallegos* is a recent case, only five years old, from this circuit, dealing with facts and claims almost identical to those herein. It is controlling on the outcome of this case. Unlike *Dunaway*, *Gallegos* deals with and answers the same claims that Plaintiff has raised. The facts in the current dispute and in *Gallegos* are extremely similar, and differ only slightly in that the officers in *Gallegos* took actions that went *beyond* what Plaintiff experienced. Furthermore, rather than determining whether a statement made after an improper arrest can be used, as in *Dunaway,* the court in *Gallegos* determined whether Gallegos had been detained, rather than arrested, for purposes of a § 1983 claim. *Gallegos*, 308 F.3d at 991-992. Thus, the court was facing the very same issue as in this case: whether police actions constituted merely a detention, or a full-blown arrest. Lastly it should be noted that the court in *Gallegos* did not even find it necessary to discuss or cite *Dunaway*, a U.S. Supreme Court case, because the issues presented and the facts of the two cases are so dissimilar.

The pertinent facts in *Gallegos* are these. In a 911 call, police learned that someone had attempted to burglarize a residence and was currently fleeing in a truck. *Id.*

at 898.   Police stopped Gallegos a few miles down the road, ordered him out of his vehicle at gunpoint, handcuffed him and placed him in the back of a police car.   *Id*. Neither officer questioned Gallegos to determine his identity; they only knew that he matched the general description of the suspect.   *Id*.   Police officers then removed Gallegos from the area of detention and drove him a few miles back to the location of the incident to have witnesses identify him.   *Id*.   Upon arriving at the scene, a witness identified Gallegos as a neighbor of the residence and not the suspect.   *Id*.   At this time Gallegos' family exited their home and became very upset at seeing him handcuffed in the back of a police car.   *Id*.   After learning his identity, police released Gallegos and returned him to his vehicle, having detained him for 45-60 minutes.   *Id.*

The Ninth Circuit, in upholding the District's Court grant of summary judgment for defendants, focused on the reason for the investigatory stop (to determine if Gallegos was the suspect they were looking for) and on whether the actions the police took to determine this were reasonable based on the total, unique circumstances of the situation. *Id*. at 991.   The court found that, under circumstances similar to those in the present case, the police had reasonable suspicion to stop and detain Gallegos and that the actions taken by the police to determine his identity were reasonable for the situation.   *Id*. at 991-992.

> For police to draw their guns in ordering Gallegos from the truck, when unsure if he was armed; for police to handcuff Gallegos in the back of a patrol car, when unsure of who he was; and for police to bring him back to Melbourne Ave. − this was not, under the circumstances, an unreasonable way of finding out if Gallegos was the person they were looking for.   *Id.*

Furthermore, in determining whether reasonable suspicion exists, courts must look to the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273-274 (2000), (quoting *U.S. v. Cortez*, 449 U.S. 411, 418, (1981)). Thus because the court in *Gallegos* determined that based on the "totality of the circumstances" the police had reasonable suspicion to detain Gallegos, a grant of summary judgment for defendants was upheld.

In the present case Officers Voss and Henikman took similar, although less intrusive, actions than the officers in *Gallegos* to determine if Plaintiff was the suspect who had minutes before robbed a bank. Officers Voss and Henikman only stopped Plaintiff after she exited the location of the crime and matched the general description of the suspect. Voss Aff. ¶ 4-5 dkt 51; Henikman Aff. ¶ 5 dkt 52; Ex. A at 14 dkt 50; Ex. D at 11, lines 5-22 dkt 50. As in *Gallegos*, officers were unsure if Plaintiff was armed, as there had been reports of a gun from the bank teller, (Ex. A at 14 dkt 50; Voss Aff. ¶ 3 dkt 51), so after Plaintiff was stopped she was placed in handcuffs, (Voss Aff. ¶ 5 dkt 51; Henikman Aff. ¶ 6 dkt 52), for 20-30 minutes (Mitchell depo., Ex. E at 22, lines 15-18 dkt 50). However, unlike the officers in *Gallegos*, Officers Voss and Henikman did not place Plaintiff in the back of a police car, nor remove her from the scene of the stop. Ex. A at 61, 65 dkt 50. They simply waited a short period of time until, as in *Gallegos*, they could have a witness identify whether plaintiff was the suspect. Voss Aff. ¶ 9 dkt 51; Henikman Aff. ¶ 10 dkt 52.

### 2.     _Facts of Detention in Dunaway Make It Inapplicable Here._

Plaintiff argues that the current case is analogous to _Dunaway;_ however, as stated above, this case nowhere near approaches the facts of _Dunaway_ and Plaintiff's reliance on it is misplaced.  The _Dunaway_ court dealt with a set of facts extremely different from the current controversy.  Police used information gathered from a jailhouse informant to seize Dunaway at a friend's home for a crime that had been committed almost five months prior to his seizure.  _Id_. at 203.  After being "picked up" by detectives, who were sent for that specific purpose, Dunaway was put into the back of a police car, taken from the residence and driven to the _police station_.  _Id._  Upon arrival at the police station, Dunaway was placed into an interrogation room, given his _Miranda_ warnings and then _interrogated_ by police.  _Id_.

As is plain to see, these are very different facts from the present case and it is easy to ascertain why the court held that Dunaway's detention was indistinguishable from a traditional arrest.  _Id_. at 212.  However, in the current action Officers Voss and Henikman were not given specific instructions to go "pick up" Plaintiff for a crime that had been committed months ago; they were responding immediately to reports of a bank robbery.  Moreover, Officers Voss and Henikman did not seek Plaintiff out as the officers in _Dunaway_ had sought him, nor did they have any prior knowledge that Plaintiff was at the scene.  Voss Aff. ¶3-4 dkt 51; Henikman Aff. ¶ 3 dkt 52.  Plaintiff was only stopped after police saw her exit the location of the crime and noticed that she generally matched the

description of the suspect. Voss Aff. ¶ 4-5 dkt 51; Henikman Aff. ¶ 5 dkt 52; Ex. A at 14

dkt 50; Ex. D at 11, lines 5-22 dkt 50.  Furthermore, unlike Dunaway, after being stopped

by the police, Plaintiff was not put into a police car, or removed from the scene.  Ex. A at

61, 65 dkt 50.  Additionally − as Plaintiff herself points out − Officers Voss and

Henikman did not seek to question her, take her to the station or another distant location,

or place her in an interrogation room.  (Plaintiff's Response at 17.)  The officers' lone

aim in stopping Plaintiff was to determine, in the quickest way possible, whether she was

the suspect involved in the robbery of the bank.  Voss Aff. ¶ 6-7 dkt 51; Henikman Aff. ¶

7-8 dkt 52.  After they had done so she was quickly released.  Voss Aff. ¶ 9 dkt 51;

Henikman Aff. ¶ 10 dkt 52.

It is also important to point out that the *Dunaway* court was not, as Plaintiff

contends, creating a bright line between an arrest and investigatory stop.  (Plaintiff's

Response at 12.)  In *Dunaway*, the Court was simply making the point that, when

egregious facts such as those present in *Dunaway* exist, it will not matter whether the

police refer to their actions as a "detention" when it really is an arrest.  As the Court itself

stated,

> (T)he detention of petitioner was in important respects indistinguishable from a
> traditional arrest. Petitioner was not questioned briefly where he was found.
> Instead, he was taken from a neighbor's home to a police car, transported to a
> police station, and placed in an interrogation room.

*Dunaway* at 212.

The Court in *Dunaway* was not drawing a "bright line"; it was simply calling a duck a duck − or, in this instance, an arrest a arrest. *Id*.

Furthermore, in determining whether to apply a balancing test, the *Dunaway* court addressed the issue in terms of circumstances that are not present in this case. As Plaintiff points out, the court was addressing whether "to apply a balancing test, rather than the general rule, to *custodial interrogations*, and to hold that "seizures" such as in this case may be justified by mere "reasonable suspicion". (Plaintiff's Response at 13, emphasis added). However, as addressed above, Plaintiff shows no facts which could support a finding that she was subjected to custodial interrogation, or that the stop Plaintiff experienced was factually similar to what happened to Mr. Dunaway. Moreover, in relying exclusively on *Dunaway*, Plaintiff completely disregards the importance of cases such as *Gallegos* and others which stem from *Terry v. Ohio*, 392 U.S. 1 (1968), in which the federal courts have applied the holding of *Terry* to factual settings like this one. Many of these have been decided in the decades since *Dunaway*.

As the Supreme Court has made clear, "the Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *U.S. v. Arvizu*, 534 U.S. at 273, (quoting *Terry*, 392 U.S. at 9; *Cortez*, 449 U.S. at 417). Additionally, the Court in *Terry* held that police can stop and briefly detain a person for investigative purposes, if the officer has a reasonable suspicion supported by articulable

facts that criminal activity "may be afoot," even if the officer lacks probable cause. *Terry*, 392 U.S. at 30.

Over the years courts have expanded the scope of a "Terry stop" to include more than just a quick "pat down" search for weapons as long as the police have a reasonable suspicion that the person may be involved in criminal activity. *Gallegos*, 308 F.3d at 990. Following *Terry* and its progeny, Officers Voss and Henikman were well within the law when they briefly detained Plaintiff, because they had a reasonable suspicion she might be the suspect involved in the bank robbery.

### 3.      *"Totality of Circumstances" Gave "Reasonable Suspicion" to Detain.*

When discussing how reviewing courts should make reasonable-suspicion determinations, the Supreme Court has repeatedly said they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *U.S. v. Arvizu*, 534 U.S. at 273-274, (quoting *U.S. v. Cortez*, 449 U.S. 411, 418 (1981)). This totality process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person", thereby giving more freedom to officers to determine what is necessary in a wide range of situations. *Id*.

On numerous occasions the Supreme Court has also opined upon the fluidity and lack of bright lines as to when law enforcement has reasonable suspicion to stop a person.

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions

that deal with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"

*Ornelas v. U.S.,* 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949))).

As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules."

*Ornelas* at 695-696 (quoting *Gates* at 232.)

Thus when reviewing the actions of police officers, courts must look at the "totality of the circumstances," including the complete information that was available to the officers. In this case Officers Voss and Henikman were informed that a bank robbery had just taken place; they received a short radio description of an armed suspect, and shortly after arriving on the scene they noticed Plaintiff exiting the location of the robbery. Henikman Aff. at para. 2, 3 and 5 dkt 52; Voss Aff. at para. 2-4 dkt 51. Both officers agreed that Plaintiff generally matched the description of the suspect that they had received by radio, thereby giving them a particularized and objective basis for believing Plaintiff may have been involved in criminal activity. Voss Aff. at para. 4-6 dkt 51; Henikman Aff. at para. 5-7 dkt 52. Logically, therefore, they stopped and treated Plaintiff as they would any other armed suspect who had just committed a serious crime. *Id.* Based on all the information available to officers at the time of the detention and based on the totality of the circumstances, it was reasonable for officers to detain Plaintiff until they could determine whether she was the robbery suspect.

### 4.    *Use of Handcuffs, Pat-Down, Short Detention Do Not Indicate an Arrest.*

Contrary to Plaintiff's assertions, courts on numerous occasions have stated that there are no bright line rules as to when a suspect has been arrested.  Plaintiff's Response at 12.  As the court in *Gallegos* pointed out,

> Our cases have made clear that an investigative detention does not automatically become an arrest when officers draw their guns, see, e.g., *United States v. Buffington,* 815 F.2d 1292, 1300 (9th Cir. 1987) (no arrest when defendants were forced from their car and made to lie down on the pavement at gunpoint); use handcuffs, *see, e.g., Allen v. City of Los Angeles,* 66 F.3d 1052, 1056-58 (9th Cir. 1995) (defendant ordered to exit car and lie on the ground, then handcuffed with gun pointed at his head, ultimately determined not to be an arrest), or place a suspect in the back of a patrol car, see *U.S. v. Parr,* 843 F.2d 1228,1229-32 (9th Cir. 1988) ("Certainly, there is no per se rule that detention in a patrol car constitutes an arrest.").  *Gallegos,* 308 F.3d at 991-992.

As is plain to see, the Ninth Circuit's cases have already established that, on undisputed facts like those in this case, an arrest did not occur.

Courts themselves have lamented that, in order for law enforcement to effectively do their job, sometimes innocent citizens are detained for short periods of time.

> Of course, it is unfortunate that an innocent man, in the wrong place at the wrong time, was inconvenienced for up to an hour. But by the same token, this investigative stop worked as it should. The detention was brief, calculated solely to make sure they had the right man, and resulted in Gallegos's prompt vindication. 'Terry accepts the risk that officers may stop innocent people.'

*Gallegos,* 308 F.3d at 992 (Citing *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000).

What happened to Plaintiff is simply one of the risks that the courts have allowed for almost 40 years.  *Terry*, 392 U.S. at 30.  The stop was brief, based on articulable facts and was only as long as necessary to quickly determine if Plaintiff was the suspect they were looking for.  This is exactly what *Terry* and its progeny are designed to do.

Sometimes innocent people are stopped for short periods of time, but this is one of the risks that must be accepted in order for police to be able to protect the welfare of society as a whole.

> ### 5. *Gallegos Controls Sec. 1983 Claims; Howard Controls State Claim.*

Plaintiff is incorrect in stating that Defendants' motion focuses primarily on Alaska case law. (Plaintiff's Response at 11.)  In fact, Defendants' extensive Sec. 1983 briefing, pages 6-13 of their Motion, relies first on the federal *Terry* line of cases.  From the introductory section at page 6, right through to page 13, every portion of Defendants' brief relies on *Terry* and/or *Gallegos*.  Some sections also address *Howard* and the Alaska Statutes secondarily.  This in no way invalidates Defendants' arguments under federal law.  At the same time, these sections lay a legal foundation for Defendants' subsequent analysis of the state tort claim for "false arrest," treated at pages 13-16 of Defendants' brief.

Plaintiff is correct (Response at 10) that Defendants mistakenly cited and referred to *Howard* as an Alaska Supreme Court case. From that point in her argument, however, Plaintiff stumbles, going on to argue for disregarding *Howard*, Response at 11.  She says the Alaska Supreme Court has "not adopted" *Howard*.  In fact, the Court has not even cited it, except on a different point.  This may be for either of two reasons: either the Court has not been presented with the issue, or else the Court approves the *Howard* analysis, and therefore denies all Petitions for Review raising the issue.  Neither possibility should convince this Court to disregard *Howard*.  *Howard* is controlling on the

state claims, *see below*. As to the federal claims, on the facts of this case, *Howard* is instructive and does not conflict with federal case law.

**B.     *Plaintiff Misses Defendants' Argument, Battles a Straw Man Instead.***

Plaintiff turns a blind eye to Defendants' argument on this issue.  To do so, she sets up a "straw man" to knock down.  This is her fictive construct: that Defendants actually arrested Plaintiff; that they did so without probable cause; and that they now seek to backtrack by showing they *did* have probable cause. This is nonsense and is not Defendants' argument, as the Court can see from Defendants' Motion at 13-16.  Plaintiff puts words in Defendants' mouths, attributing to them a "theory" they never espoused: "[T]he Municipality apparently is advancing the *theory* that if this court concludes that Officer Henikman did in fact arrest Mitchell, the arrest occurred based on probable cause to arrest.  Continuing its *theory* . . ." etc.  (Plaintiff's Response at 19, emphasis added).

In order to disregard Defendants' careful briefing, Plaintiff had to put on her blinders and read right past the word "*arguendo*" – not once, not twice, but three times. If Plaintiff's best argument to defeat summary judgment on "false arrest" is to pretend Defendants argued that they had "probable cause" all along – something they have not argued – the Court may simply move on to the next issue.

**C.     *Without a "Business Relation," Plaintiff Makes No Case for Per Se Defamation.***

On the "defamation *per se*" issue, Plaintiff seeks support from *Alaska Statebank v. Fairco,* 674 P.2d 288 (Alaska 1983). But the facts in *Fairco* were vastly different. There, defendant had used deliberate, purposeful, coercive conduct aimed directly at plaintiffs' business. Those facts amply distinguish *Fairco* from the present case.

But Plaintiff goes farther, relying on one of the cases the Alaska Supreme Court cited in *Fairco*, *Cook v. Safeway Stores, Inc.*, 511 P.2d 375 (Oregon 1973). What made the alleged conduct or statement in *Cook* actionable *per se*, the *en banc* Oregon Supreme Court made clear, was the *relationship* of that statement or conduct's *to plaintiff's business*.

> Where the words have been spoken *in relation to employment or business*,
> the law presumes damage to employment or business reputation.

*Id.* at 378-79 (emphasis added.)

In *Fairco,* the wrongful conduct by the bank *specifically concerned* plaintiffs' business and was *directed at* their business. Injury had clearly occurred, and the injury was to the reputation of the business and the business partners.

Here, the alleged wrong neither concerned Plaintiff's business, nor was it directed at her business. Without any such "business relation", Plaintiff herein fails to make a case for *per se* defamation.

To lean on *Fairco,* for *per se* defamation, Plaintiff must show the allegedly wrongful statement concerned her business or profession. Such a statement might impugn her competence as a beautician by alleging she used unsafe chemical products

which harmed her clients.  Similarly, a statement that distributors should beware of selling products to her shop because she was unable to pay her bills might be *per se* actionable.  Here, however, the injury, if any, was not to her business, but was personal only – an alleged Constitutional wrong, inconvenience, embarrassment and emotional injury.

As far as Plaintiff's business is concerned, this event was random; it could have happened to any person, in any walk of life, who had the bad luck to resemble the fleeing felon, and to be close to the scene of the crime, minutes after it had occurred.  Nor does she show that anyone noticing her during her detention was even aware she was a business owner.  Even assuming Plaintiff could show any loss to her reputation as a beautician, or the reputation of her beauty parlor, she still could not show *per se* defamation because the allegedly wrongful "statement" or conduct had nothing to do with her business.

Nor has Plaintiff raised a genuine issue of material fact as to special damages, nor brought facts, witnesses or documents in support.  Just *saying* the event harmed her business does not make it true.  As she cannot show any kind of actual damages to her damages, and does not qualify for *per se* general damages as a matter of law, Plaintiff's business loss claim must fail.

**D.    <u>The IIED Claim Cannot Survive the Required "Threshold Determination".</u>**

Oddly, in briefing this subject, as well as others, Plaintiff fails to respond in any fashion to the cases Defendants cited.  She doesn't even cite and distinguish *Lybrand v.*

*Trask*, 31 P.3d 801 (Alaska 2001). There, the Alaska Supreme Court ruled against the plaintiff on this issue, despite defendants' deliberate offensive conduct, because that conduct was not sufficiently outrageous, and did not involve "multiple concerted efforts" to harm her. *Id.* at 804.

Instead, the only case Plaintiff cites is *Wal-Mart, Inc., v. Stewart*, 990 P.2d 626 (1999). She evidently chooses it for its shocking, egregious facts that led to an outcome which she likes.

The *Wal-Mart* case, however, completely fails to answer Defendants' arguments. The facts in *Wal-Mart* show deliberate, offensive conduct repeated daily over a period of some months, singling out Mr. Stewart, conduct which the Wal-Mart assistant manager himself admitted was because of Mr. Stewart's race. Plaintiff cuts short her excerpt from *Wal-Mart,* Response at 23, and quotes only the elements of IIED – but omits the requirement that the trial court make "the threshold determination of 'whether the severity of the emotional distress and the conduct of the offending party warrant an instruction on [IIED].'" (*Id*. at 635, footnote omitted.)

This Court is now equipped to make that "threshold determination," Defendants submit: Plaintiff has failed to show there is a genuine issue of material fact as to either the severity of her distress, or the conduct of Defendants.

## CONCLUSION.

In most respects Plaintiff's Response does not even meet Defendants' arguments and legal authorities. Most importantly, her Response completely fails to recognize that

*Dunaway* is irrelevant and *Gallegos* is controlling in this Circuit, on the undisputed facts.

Defendants' Motion for Summary Judgment should be granted on all claims.

Respectfully submitted this 12th day of June, 2007.

JAMES N. REEVES
Municipal Attorney


By:    s/ Joyce Weaver Johnson
       Municipal Attorney's Office
       P.O. Box 196650
       Anchorage, Alaska 99519-6650
       Phone: (907) 343-4545
       Fax: (907) 343-4550
       E-mail: uslit@muni.org
       Alaska Bar No. 9306029


The undersigned hereby certifies that on 06/12/07 a
true and correct copy of the *Defendants' Reply to
Response to Defendants' Motion for Summary Judgment*
was served on:

Isaac D. Zorea
and
Moshe C. Zorea

by first class regular mail, if noted above, or by electronic
means through the ECF system as indicated on the Notice
of Electronic Filing.
 s/ Sheri Curro
Sheri Curro, Legal Secretary
Municipal Attorney's Office