Joyce Weaver Johnson
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
E-mail: uslit@muni.org

Attorney for Defendants
Municipality of Anchorage
Anchorage Police Department
Walt Monegan
Officers Voss and Henikman

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| CAROLYN MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT and the MUNICIPALITY OF ANCHORAGE, a municipal corporation, WALTER MONEGAN, Officer HENIKMAN, and Officer J. VOSS, | ) ) ) ) |
| | ) |
| Defendants. | ) Case No. 3:05-cv-00273-JWS |
| | ) |

**AFFIDAVIT OF CAPT. BILL MILLER**

STATE OF ALASKA        )
                       ) ss.
THIRD JUDICIAL DISTRICT )

Bill Miller, being first duly sworn upon oath, deposes and states:

1. I am a Captain with the Anchorage Police Department. I have been with APD for over 21 years. During that time I have been assigned to patrol shifts as a line officer, a Burglary Detective, a sergeant in charge of a street level drug/prostitution/gambling unit (G.I.U.), a sergeant in Internal Affairs, a shift commander, the Captain of the Major Crimes Division, the deputy Chief of Operations, the Captain of Personnel, and now serve as the Captain of the Patrol Division. During my tenure with the Anchorage Police Department I have been an instructor of the subjects of Officer Survival, Firearms, Domestic Violence, Methods of Instruction and First Line Supervisor. I train for both the Anchorage Police Department and the Alaska Police Standards Council and have trained in various cities of Alaska for a number of agencies as well as for the National Police in Costa Rica C.A. Prior to joining the Anchorage Police Department I was an Alaska State Trooper assigned to the Soldotna Detachment for approximately two years. In that capacity I performed the typical duties of a Trooper in a semi-rural post. Before being a Alaska State Trooper I was in the U.S. Air Force for four years as a Law Enforcement Specialist. My duties included entry control to the air base, routine patrol, Emergency Service Team, and forward air base defense.

2. I have reviewed the District Court's decision (dkt. 76) in this case finding Officers Voss and Henikman committed the tort of false arrest under Alaska common law. I have also reviewed the police report, Channel 2 television videotape, and Calls for Service Inquiry Response consisting of data entries noted during an event. To me, it

seems clear this was no arrest under any definition, but rather, an appropriate detention to investigate a crime.

3. It is unclear to me on what basis the Court found an "arrest", rather than a detention to investigate a crime. The officers detained her only as long as necessary for the victim to be brought by to say whether Ms. Mitchell was the one who had robbed her. From reading the decision, it appears the Court's ruling may have been based on concern about one or more of these factors: (a) length of detention; (b) use of handcuffs; (c) display of firearms; (d) not questioning her about the robbery, and (e) Plaintiff not being perceived as a safety concern. I will address each of these from my experience as an officer/commander and trainer.

(a.) <u>Length of detention.</u> Every day, APD must detain suspects for 20-30 minutes or longer before "reasonable suspicion" for the stop leads to "probable cause" for an arrest. This may occur in connection with any kind of crime. A familiar example would be a traffic stop of someone driving erratically, which ultimately turns into an arrest for driving under the influence. It typically takes 45 minutes to an hour to make contact with the driver and obtain his identification; run the name to determine whether the driver has outstanding warrants or poses a particular danger to officers, whether the driver's license and registration are valid, etc., and administer field sobriety tests. In dangerous road or adverse weather conditions, with an uncooperative suspect, or with a carload of passengers requiring a backup officer, it may take even longer. These time-consuming steps are essential to maintain the required balance between the safety of the public, and

the rights of the individual suspect. If 20-30 minutes were too long for the investigatory detention leading to a DUI arrest, or any other kind of investigation, we absolutely could not do our job.

My review of the computer data shows that clearing the mall to the point where the first of APD's units could leave, and the public could begin to enter, took an hour and 20 minutes. (See Exhibit C to MOA's Motion for Summary Judgment, data entry at 16:49:27.) Until then, it was an active crime scene; we were searching for a dangerous offender and trying to safeguard mall employees and the public. Intense effort by many personnel was needed to clear such a big building, containing so many people, so many stores, places to hide, entrances and exit points. Plaintiff was actually lucky to be detained only 20-30 minutes. At such a crime scene, unfortunately, sometimes a citizen's freedom and convenience have to temporarily take a back seat to public safety.

(b.) Use of handcuffs. Handcuffs are needed for officer safety, safety of the public, and even the safety of the suspect herself. They are not used just so we can check for weapons. In fact, we routinely use them with persons we do not anticipate arresting, for example, persons present in a home when we arrive to execute a search warrant. In such a situation, the handcuffs help make sure evidence, such as drugs, isn't destroyed or removed, and secure the scene while we sort out who is present. To remove handcuffs after a weapons check, or because the suspect seems like a nice lady who wouldn't hurt anyone, is a big mistake, and we train our officers accordingly. If it turned out we needed to arrest and transport her after all, we would have to handcuff her a second time, and in

my experience, this tends to anger people much more than the first time. With anger comes struggling, and increased danger that someone will be injured. Even without handcuffs, a suspect may feel trapped and go for the officers' guns, take a hostage, or run away. Such an escalation of the incident endangers everyone – the general public, the officer, and the suspect herself. Moreover, handcuffs operate as a psychological barrier, making a suspect less prone to resist. It was wise to keep Ms. Mitchell handcuffed until the victim confirmed she was not the robber.

Handcuffs are not 100 percent effective. We have seen handcuffed suspects injure police and others by head-butting or kicking. Moreover, officers sometimes miss a weapon when they search. A weapon such as a knife concealed in the waistband may still be within the suspect's reach despite the cuffs. Officers must remain vigilant.

As a commander, if I learned that our officers had not kept someone in Ms. Mitchell's situation handcuffed pending the showup, I would instruct their sergeant to counsel and correct them. That is the kind of slipup that gets officers killed. In addition, I have read about civil cases faulting officers for failing to properly restrain a person or secure a scene, where their failure to do so caused an escape or escalation, resulting in a citizen getting hurt or killed. To prevent such tragedies and the civil liability that may follow, we train our officers to take the proper precautions.

(c.) <u>Display of firearms.</u> It was absolutely appropriate for the officers to keep their weapons "at guard," as shown on the television video. (Exhibit F to dkt. 50). They should not put them away after searching a suspect for weapons. Moreover, our firearms,

like our handcuffs, have the important psychological effect of deterring suspects who are considering running, taking a hostage, etc.

The Court has the benefit of knowing, now, that Ms. Mitchell was not the armed bank robber. The officers did not have that luxury, and it was their job to proceed on the assumption that she was dangerous.

(d.) <u>Not questioning her about the robbery.</u> These patrol officers were dispatched to secure the scene and try to prevent the escape of the robber. They were assigned to make sure the Plaintiff and other persons and events nearby did not pose a threat, and to hold her for the showup. Their doing so allowed others to interview witnesses, look for fingerprint evidence, conduct the showups, etc. Had Officers Voss and Henikman turned their attention to investigating the crime, they would have neglected their responsibility to keep accomplices or innocent citizens from entering the mall, and to keep suspects from escaping. The investigation was being done by the case officer, specialized detectives and/or FBI agents. For these patrol officers to question Plaintiff about the robbery, without knowing the details of the crime, would jeopardize that investigation. A separate mini-investigation of Ms. Mitchell, just to hasten her release or arrest, was inappropriate. Moreover, it would require reading her Miranda rights and recording the interview. This would be far more intrusive than simply allowing the victim to view her and rule her out as the robber.

(e.) <u>Plaintiff not being perceived as a safety concern.</u> Whether or not the officers subjectively perceived Plaintiff as dangerous should not change their response. Nor does

it matter whether they felt afraid of her. Such subjective perceptions can help officers analyze a threat, but they do not govern police decision-making in the wake of a dangerous crime. Moreover, officers encounter dangerous situations almost daily; they may or may not react emotionally as civilians would do. Rather than depend on a gut reaction to danger, they are trained to analyze the surrounding circumstances and respond purposefully. In this case, they properly acted on the assumption that the robber and/or accomplices could still be at large. Again, the perception that this was too nice a lady to be a criminal, a relaxed feeling, or a hunch that she wouldn't turn out to be the actual robber, must not put them off their guard.

   4. Much of the work our 390 sworn officers do every day appears to put them at serious risk of civil tort liability for false arrest, as I read the Court's ruling. Again, I could not tell which factors went into the Court's ruling. However, if those factors include detaining Plaintiff 20-30 minutes for the victim of a serious crime to come and view look-alikes, the use of handcuffs pending such a viewing, the presence and display of firearms, not questioning her about the robbery, and/or the fact that they didn't subjectively feel fear, then the ruling has very serious implications for the daily work of all Alaska law enforcement officers.

/

/

/

FURTHER YOUR AFFIANT SAYETH NAUGHT.

By: _____
Capt. Bill Miller

SUBSCRIBED and SWORN to before me this 11th day of January, 2008.



_____
Notary Public in and for Alaska
My commission expires: 2/14/09

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

The undersigned hereby certifies that on 1/15/08 a true and correct copy of the *Affidavit of Capt. Bill Miller* was served on:

       Isaac D. Zorea
       Moshe C. Zorea

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

 s/ Sheri Curro
Sheri Curro, Legal Secretary
Municipal Attorney's Office