Joyce Weaver Johnson
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
E-mail: uslit@muni.org

Attorney for Defendants
Municipality of Anchorage
Anchorage Police Department
Walt Monegan
Officers Voss and Henikman

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CAROLYN MITCHELL, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ANCHORAGE POLICE DEPARTMENT and ) <br> the MUNICIPALITY OF ANCHORAGE, a ) <br> municipal corporation, WALTER MONEGAN, ) <br> Officer HENIKMAN, and Officer J. VOSS, ) <br> ) <br> Defendants. ) <br> _____ ) | <br><br><br><br><br><br><br><br><br><br><br><br>Case No. 3:05-cv-00273-JWS |

**AFFIDAVIT OF FBI SPECIAL AGENT STEVEN M. PAYNE**

STATE OF ALASKA         )
                        ) ss.
THIRD JUDICIAL DISTRICT )

I, Steven M. Payne, Special Agent, Federal Bureau of Investigation (FBI), Anchorage, Alaska, being first duly sworn, upon oath, depose and say:

1. I am currently employed as a Special Agent (SA) for the Federal Bureau of Investigation (FBI) and have been so employed since October of 1996. During my employment with the FBI, I have been assigned the investigation of criminal matters within the jurisdiction of the FBI, with emphasis in the areas of bank robbery, violent street gangs, drug trafficking, fugitives, crimes aboard aircraft, the sexual exploitation of children and white collar crime. I have been assigned to a violent crime and drug squad within the Anchorage Office of the FBI since October of 1998. I have been the Bank Robbery Coordinator (BRC) for the FBI's Anchorage Office since approximately October of 2000. In this capacity, I am notified of bank robberies that occur throughout Alaska and many locations in the rest of the United States. I also routinely respond to the scene and participate in the investigation of most bank robberies in the Anchorage area. I have participated in the investigation of over 100 bank robberies during my career with the FBI.

2. I have reviewed the District Court's decision (dkt. 76) in this case finding Anchorage Police Department (APD) Officers Voss and Henikman committed the tort of false arrest under Alaska common law, during their response to the robbery of the Wells Fargo Bank (WFB) Branch located inside the Sears Mall in Anchorage, Alaska, on 05/08/2004. I have also reviewed APD Captain Bill Miller's affidavit and his analysis concerning: 1) the length of detention; 2) the use of handcuffs; 3) the display of firearms; 4) the lack of questioning about the robbery; and 5) the apparent perception of Officers Voss and Henikman that Carolyn Mitchell, who appears to have been temporarily detained as a suspect in this matter, was not dangerous or threatening. I also participated in the law enforcement response to this bank robbery.

3. The APD provides an emergency law enforcement response to appropriate calls for service, including bank robberies, within the Municipality of Anchorage (MOA). In this capacity, APD Officers who respond to bank robberies are usually the first law enforcement personnel to arrive at the scene. Consequently, their initial responsibilities generally include securing the scene; identifying potential victims, witnesses, hostages

and subjects; identifying and securing potential evidence; obtaining an overview of the situation; and requesting additional emergency service personnel, such as paramedics or additional officers, if necessary.

4. During their initial bank robbery response, one or more APD officers will generally identify and contact the victim teller(s) and other witnesses, to obtain an overview of the alleged crime and a description of the robber(s). This description and any additional pertinent information, such as whether or not the robber is armed, vehicle(s) and/or accomplice(s) that may be involved, and the robber's last known direction of travel, are generally immediately disseminated to other responding officers. This information allows arriving officers to locate and possibly detain potential subjects, identify evidence, and be alert for potential officer and public safety concerns.

5. Although the initial information is generally collected and disseminated within a few minutes of the officer(s)' arrival, it can be delayed significantly when the victim teller(s) and/or other witnesses are injured or particularly upset by the robbery, as this can result in difficulty communicating with these individuals and/or delay their ability to participate in "show-ups" with potential subjects. It often requires additional time to resolve conflicting information that is obtained from the victim teller(s) and/or other witnesses, especially if it's pertinent to officer or public safety, the description of accomplices, getaway vehicle(s) or the robber(s)' last known direction of travel.

6. Upon completion of the initial information collection and dissemination process, the officers who conducted it often brief other arriving officers and FBI Agents, as well as, APD Dispatch. They may also begin the process of identifying and collecting potential evidence, such as latent prints, video surveillance footage, the demand note (if applicable), etc. However, they may leave the interior of the bank to assist in the search for the robber(s), collect evidence, conduct one or more "show-ups" with the victim teller(s) or other witnesses, or respond to associated officer or pubic safety threats, depending on the situation. The responding FBI Agents, which usually number between 2 and 4, generally focus on obtaining an overview of the bank robbery and associated

crime scene, conducting victim and witness interviews and collecting non-latent print evidence. However, they may also assist APD officers with neighborhood canvasses, "show-ups" or other elements of the initial response and investigation, as necessary.

7. The identification and brief detention of potential subjects for further investigation by responding officers and agents is a longstanding investigative technique that is routinely used during the initial response and investigation of bank robberies. This technique is based on the subject(s)' similarity to the description of the robber(s), especially physical characteristics that cannot be quickly or easily altered, such as gender, race or complexion, height, weight, age, scars, marks, tattoos, and visible physical impairments such as a limp. Other factors that are considered are the subject(s)' proximity to the crime scene and their possession of potential evidence, such as a weapon similar to the one used during the commission of the bank robbery, an electronic tracking device or dye-stained money.

8. An officer or agent's initial contact with a potential subject who appears to match the description of the bank robber will be dictated by many factors, some of which are: 1) whether or not the robber is believed to be armed and/or violent; 2) the number and presence of potential accomplices; 3) the environment in which the contact occurs (i.e. dark or secluded area versus a large, open area with many innocent bystanders, etc.); 4) the proximity of additional law enforcement personnel; 5) the subject(s)' disposition when contacted by the officer or agent (i.e. compliant, hostile or threatening); 6) the officer or agent's perception of actual or potential threats posed by the subject(s) and/or the environment; and 7) relevant laws, regulations and agency policy.

9. If the officer or agent is responding to a report of an armed bank robbery inside a large crowded shopping mall, his or her initial contact with a potential subject may be understandably different than it would be to a report of an unarmed bank robbery in a small standalone building. The former scenario may result in contacting the potential subject(s) at gunpoint and securing them in handcuffs, for officer and public safety reasons, until such time as the their identity can be confirmed and/or a "show-up" can be

conducted with the victim teller(s) and/or other witnesses, to identify the subject(s) as the robber(s) or rule them out. By contrast, the latter scenario may result in a contact where the potential subject(s) are controlled via verbal commands and/or secured in handcuffs, for officer and public safety reasons, until such time as the their identity can be confirmed and/or a "show-up" can be conducted with the victim teller(s) and/or other witnesses, to identify the subject(s) as the robber(s) or rule them out.

10. During the aforementioned investigative detention scenarios, the contacting officer or agent will not normally remove the detainee from the general area where he or she was contacted, other than for safety reasons. In addition, the contacting officers will often limit questions to those necessary to identify the potential subject(s), determine their purpose for being in the area where they were contacted and/or their association with a vehicle or other individuals who are believed to be involved in the bank robbery, if applicable. The contacting officer(s)' will promptly notify other law enforcement personnel at the scene of the bank robbery that they have detained potential subject(s) and request that a "show-up" be conducted with one or more of the victim teller(s) and/or witnesses as soon as possible.

11. Although it generally requires only a few minutes to conduct a typical "show-up," it can easily take 5-10 minutes to calm the victim(s) or witnesses, answer their questions about the process, obtain their consent to participate in the "show-up," arrange the "show-up" location to be as safe and objective as possible, and transport the victim(s) and/or witnesses to the location of the potential subject. If multiple potential subjects have been simultaneously detained at different locations, or if multiple "show-ups" need to be conducted with the same potential subject, the delay can be several times the period necessary to conduct a single "show-up."

12. The contacting officers will not normally Mirandize the potential subject(s) or ask them questions regarding the bank robbery, because often they do not have all of the information regarding the specific circumstances of the bank robbery, the evidence that has been collected and/or witness statements. This information is often critical to

conducting an effective subject interview, especially when a "show-up" has not or cannot be conducted. Furthermore, taking an individual into custody, moving him or her to a secure location, Mirandizing him or her and conducting a subject interview, which is often adversarial, is significantly more time-consuming, intrusive and potentially threatening than simply conducting a "show-up" with a victim or witness who can potentially identify or eliminate them as the bank robber after a brief observation.

13. In addition, the FBI is normally the lead investigative agency for bank robbery cases that occur in Alaska, and these offenses are generally prosecuted in federal court. By contrast, APD cases are generally investigated according to Alaska law and APD policy, and they are usually prosecuted in state or municipal court. Since these agencies and systems have different rules and few individuals are cross-trained in both systems, the mutually agreed upon protocol is for FBI Agents to conduct custodial subject interviews in bank robbery cases, unless Agents are unavailable or the case has been declined by the U.S. Attorney's Office.

14. The safe, efficient and effective performance of these duties generally requires several officers and at least 30-60 minutes, even for a robbery that occurs early in the day at a relatively small bank, with few customers and employees that is located in a standalone building. By contrast, the aforementioned reported armed bank robbery, which occurred in the middle of the afternoon at the WFB Branch located inside the Sears Mall in Anchorage, Alaska, required significantly more responding officers and time to address safely and effectively. Based on my training and experience, these additional resources and time were reasonable and necessary, given the fact that the victim bank was located inside a shopping mall that spans approximately four city blocks, houses dozens of stores with numerous exits and contained hundreds, if not thousands, of customers and employees at the time the reported armed robbery occurred. This reported armed bank robbery occurred in a very unusual location that presented several substantial difficulties and public safety concerns that have not been present in the vast majority of bank robberies that have occurred in Anchorage over at least the past eleven years.

15. Bank robberies are dynamic, rapidly-evolving incidents that can be very dangerous for everyone involved, and no two are exactly alike. Consequently, appropriate responses can and should vary substantially, depending on the circumstances of the bank robbery. Based on the aforementioned information and my training and experience, I agree with APD Captain Bill Miller's analysis of the initial response by law enforcement personnel in this case. I also believe that the officers' response in this case was professional, appropriate for the situation, and consistent with the established investigative protocol which has been in place since my assignment to the Anchorage office of the FBI.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Steven M. Payne
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 15th day of January, 2008.

Notary Public in and for Alaska
My commission expires: 4/12/2011

/
/
/

The undersigned hereby certifies that on 01/15/08 a true and correct copy of the *Affidavit of Steve Payne* was served on:

    Isaac D. Zorea
    Moshe C. Zorea

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

s/ Sheri Curro
Sheri Curro, Legal Secretary
Municipal Attorney's Office